Thomas NICHOLS et al.

v.

R.R. BEAUFORT & ASSOCIATES,
INC. et al.

No. 97–177–Appeal.

Supreme Court of Rhode Island.

March 10, 1999.

Raymond A. Marcaccio, Staci L. Sawyer, Providence, for plaintiff.

Michael D. Mitchell, Warwick, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

This case requires us to determine for the first time whether the buyers of a latently defective home can maintain an action against the house builder—with whom they lack any contractual privity—for the builder's alleged breach of implied warranties of habitability and workmanlike quality. Claiming latent defects and faulty workmanship in the construction of their home, the plaintiffs, Thomas and Candace Nichols (the Nichols), appeal from the Superior Court's entry of summary judgment in favor of the defendants, home builder Raymond R. Beaufort and his construction company, R.R. Beaufort & Associates, Inc. (collectively, Beaufort). For the reasons explained below, we affirm in part, reverse in part, and remand this case for further proceedings concerning the Nichols' claims for breach of implied warranties.

### Facts and Travel

In 1983, Beaufort built the Nichols' home on Kimberly Lane in Cranston and immediately sold it to his cousin, Debra Cronin, and her husband (the Cronins). Within two to three months after purchasing their home, the Cronins noticed large cracks in the cement floor of the garage. Beaufort described the cracks as "pretty good size[d]," "[l]arger than normal," and "[l]arger than what would be acceptable" for industry standards. Beaufort attempted to correct this problem by pouring a new garage floor in late 1983.

Approximately a year and a half later, in June 1985, the Nichols purchased the property from the Cronins and thereafter built a 16′ × 24′ addition to the existing house. The record is silent concerning whether the Cronins informed the Nichols about the garage-floor cracks. Moreover, it fails to indicate whether the Nichols conducted any pre-purchase inspection of the house or whether such an inspection would have revealed the defects about which the Nichols now complain. In any event, in 1988, some three years after the purchase of the house, the garage floor caved in. Subsequently, in 1991, Mr. Nichols noticed cracks in the walls of the addition, the kitchen, and the garage. At this point, the Nichols hired Geisser Engineering Corporation (Geisser) to investigate these problems. They soon learned that, according to Geisser, Beaufort had constructed the home's foundation on unstable soil containing voids and organic materials that had decomposed over time. These voids eventually subsided, causing the walls in the various parts of the house to crack and the garage floor to collapse.

In February 1994, the Nichols filed this action in Superior Court charging Beaufort with negligent construction, breach of implied warranties, and negligent violation of certain building-code provisions when he built the house in 1983. In due course,

Beaufort moved for summary judgment on the grounds that: (1) the absence of contractual privity between the Nichols and Beaufort barred the Nichols from bringing any of these claims against Beaufort, and (2) the applicable ten-year statute of repose for filing tort claims against the builder and others who improve real property had expired before the Nichols brought suit against Beaufort, *see* G.L.1956 § 9–1–29. After reviewing the parties' legal memoranda and hearing oral arguments, a Superior Court motion justice determined that the absence of contractual privity between the Nichols and Beaufort was fatal to the Nichols' claims. As a result, she granted Beaufort's summary-judgment motion, but did not specifically address whether § 9–1–29 barred plaintiffs' tort claims.

On appeal, we ordered the parties to show cause why we should not resolve the Nichols' appeal summarily. Cause having been shown, a panel of this Court placed the appeal on the Court's continuous argument calendar and requested the parties to brief a number of questions related to the issues raised. We now affirm in part and reverse in part, holding that: (1) even though the statute of repose barred the Nichols' negligence claims against Beaufort, they timely filed their claims alleging breach of implied warranties, and (2) such claims do not require privity of contract. Therefore, the motion justice should not have granted summary judgment on this basis.

### Standard of Review

■ This Court reviews an order granting summary judgment by applying the same standard used by the motion justice. *See Nogueras v. Ling,* 713 A.2d 214, 216 (R.I. 1998). "Viewing the evidence in a light most favorable to the nonmoving party, we examine the record, including the pleadings and any affidavits or discovery materials, to determine whether any material facts remain in genuine dispute such that the case should proceed to trial and to determine whether the moving party is entitled to judgment as a matter of law." *Id.*

### · Analysis

### I

### Statute of Repose

■ The Nichols argue that a genuine issue of material fact existed concerning whether the ten-year statute of repose prescribed in § 9–1–29 barred their tort claims.[1] Section 9–1–29 immunizes construction contractors—as well as others who construct, furnish materials for, or provide professional services in connection with improvements to real property—against tort claims that have not been brought within ten years of the improvement's substantial completion. Section 9–1–29; *see also Boghossian v. Ferland Corp.,* 600 A.2d 288, 289 (R.I.1991). Here, the uncontradicted evidence indicated that Beaufort substantially completed the construction of the Nichols' house no later than September 26, 1983, the date when the city's building official issued the certificate of use and occupancy. However, the Nichols failed to file their complaint against Beaufort until February 18, 1994, more than ten years after Beaufort substantially completed the home's construction.

■ Notwithstanding the issuance of the use and occupancy certificate more than ten years before the Nichols initiated this action, the evidence also indicated that Beaufort returned to work on the house in the late part of 1983, when he repaired the large cracks

---

1. General Laws 1956 § 9–1–29 states, in pertinent part:

"No action *** in tort to recover damages shall be brought against any architect or professional engineer who designed, planned, or supervised to any extent the construction of improvements to real property, or against any contractor or subcontractor who constructed the improvements to real property, or material suppliers who furnished materials for the construction of the improvements, on account of any deficiency in the design, planning, supervision, or observation of construction or construction of any such improvements or in the materials furnished for the improvements:

(1) For injury to property, real or personal, arising out of any such deficiency;

(2) For injury to the person or for wrongful death arising out of any such deficiency; or

(3) For contribution or indemnity for damages sustained on account of any injury mentioned in subdivisions (1) and (2) hereof more than ten (10) years after substantial completion of such an improvement ***."

that appeared in the Cronins' garage floor. The Nichols therefore assert that Beaufort did not substantially complete construction of their house until he finished this repair work. In support of their argument, the Nichols contend that Beaufort's "late part of 1983" repair work to the garage floor most likely would have continued into 1984, thereby creating a genuine factual issue concerning whether the Nichols filed their tort claims within the ten-year-statute-of-repose period. But even if we were to assume, arguendo, that such post-certificate-of-occupancy repair work could serve to extend the applicable substantial-completion date, a litigant cannot avoid summary judgment by merely posing factual possibilities without submitting admissible evidence thereof.

Here, the Nichols offered no such evidence to establish that Beaufort performed any repair work after the later part of 1983, much less that Beaufort substantially completed this work at any time on or after February 18, 1984, the last date (ten years before they filed this action) on which substantial completion of any improvement to the property could have occurred for the Nichols to have timely filed their complaint. Accordingly, no genuine issue of material fact existed concerning whether § 9–1–29's ten-year-statute-of-repose period had expired before the Nichols filed their complaint on February 18, 1994. Hence, dismissal of their tort claims on summary judgment was proper.[2]

## II

### Absence of Contractual Privity Between Plaintiffs and Defendant

■  The Nichols argue that under the circumstances of this case, the implied warranties of habitability and workmanlike quality that the law imposes upon a builder-vendor in connection with the sale of a new home should extend to protect subsequent purchasers of that home. In *Padula v. J.J. Deb–Cin Homes, Inc.*, 111 R.I. 29, 32, 298 A.2d 529, 531 (1973), we held that when a builder-vendor sells a new house or one that is under construction, "he [or she] implicitly warrants that the construction has been or will be done in a workmanlike manner and that the dwelling will be reasonably fit for human habitation." Thereafter, we extended the application of these implied warranties to a situation where a builder-vendor first created a one-year intervening tenancy and then sold what could have been characterized as a "used" house to the plaintiff-purchaser. *See Casavant v. Campopiano*, 114 R.I. 24, 327 A.2d 831 (1974). We determined that, notwithstanding the intervening tenancy, the house was still relatively "new" and that the one-year tenancy "was [not] of such [an] extended duration as to make an application of the [implied] warranties unreasonable." *Id.* at 27, 327 A.2d at 833.

The thrust of the above-cited cases was to afford protection to new home buyers from any latently defective work and possible overreaching by knowledgeable builder-vendors. However, we refused to extend the application of these implied warranties to protect used-home buyers in a suit against a vendor who was not also the builder of the house. *See Sousa v. Albino*, 120 R.I. 461, 388 A.2d 804 (1978). There, the Court reasoned as follows:

"The applicability of the implied warranty is based upon the premise that, with respect to the sale of new homes, the purchaser has little choice but to rely upon the integrity and professional competence of the builder-vendor. The public interest dictates that if the construction of a new house is defective, its repair cost should be borne by the responsible builder-vendor who created the defect and is in a better economic position to bear the loss, rather than by the ordinary purchaser who justifiably relied upon the builder's skill. ***

"On the resale of used housing the vendor usually has no greater skill relevant to determining the quality of a house than the purchaser. ***

"[I]n order for [the] plaintiffs to successfully invoke the doctrine, they should allege

---

2.  Count 4 in the Nichols' complaint alleged that Beaufort breached his duty to construct the Nichols' house in accordance with applicable building- and housing-code standards, thereby causing its defective condition. Because we deem these allegations to constitute negligence claims, the statute of repose bars them as well.

that the house, in question, is new and that it was purchased from a builder-vendor." *Id.* at 463–64, 388 A.2d at 805–06.

The Nichols assert that the principles enunciated in *Padula* and *Casavant* should apply here and that *Sousa* is distinguishable because, unlike the situation in that case, the Nichols are suing only the original builder and are not trying to hold a non-builder vendor liable for the latent defects in the house.

Recently, in answering a certified question from the United States District Court for the District of Rhode Island, this Court affirmed the need for contractual privity in a commercial setting. *See Boston Investment Property # 1 State v. E.W. Burman, Inc.*, 658 A.2d 515 (R.I.1995) (*Burman*). In *Burman*, the plaintiff was the second owner of a commercial property known as One State Street. The plaintiff claimed that the building on the property had developed leaky windows and that its parking lot suffered from erosion problems. In addition to suing the original owner and vendor for breach of contract and breach of express and implied warranties, the plaintiff also sued the builder, E.W. Burman, Inc., for negligence. Relying on our reasoning in *Hydro–Manufacturing, Inc. v. Kayser–Roth Corp.*, 640 A.2d 950 (R.I.1994) (addressing risk allocation in commercial real-estate transactions), we noted that the plaintiff, a sophisticated commercial buyer of real estate, had the option to inspect the property and to investigate any possible defects before it decided to close on such a

purchase, thereby enabling it to negotiate a fair price. *See Burman,* 658 A.2d at 517. As a result, we concluded as follows:

"An extension of tort liability for economic damages to subsequent purchases of commercial property is unwarranted. In the case of sophisticated commercial entities in the commercial real estate market, contract law is the proper device to allocate economic risk." *Id.* at 518.

Accordingly, in *Burman,* we held that in the absence of any privity of contract with the builder, a subsequent purchaser of a commercial building in Rhode Island was not entitled to recover economic damages resulting from the general contractor's alleged negligence in constructing the building.

Here, however, the Nichols argue that *Burman* is distinguishable because it involved a commercial real-estate transaction between sophisticated business entities rather than, as in this situation, a purchase by consumers of residential housing. They argue that this Court would not have reached the same result in *Burman* if the plaintiff there had been a consumer who had purchased a home containing latent defects. They point out that in reaching our decision, we were careful to anticipate this distinction when we noted "that it is appropriate for sophisticated commercial entities to utilize contract law to protect themselves from economic damages." *Id.* at 517.[3]

---

3. The Nichols also rely on *Forte Brothers, Inc. v. National Amusements, Inc.*, 525 A.2d 1301 (R.I. 1987) to support their argument that privity of contract is not a prerequisite to their suit against Beaufort. In *Forte Brothers,* a general contractor sued the supervising architect/site engineer, Allen & Demurjian (Allen), for negligently performing its duty to measure the removal of rocks and boulders from a construction site. Forte Brothers had contracted with National Amusements, Inc. (National) to excavate a particular site; National in turn contracted with Allen to gauge the amount and nature of the excavation that it required Forte Brothers to perform. Because Forte Brothers, as the general contractor, lacked privity of contract with Allen, the Court had to determine whether a third party—who might foreseeably be damaged by the negligent performance of a contractual duty owed by Allen to National—had a cause of action in negligence against Allen notwithstanding the absence of

contractual privity between them. *Id.* at 1302. First, we noted that Rhode Island does not require contractual privity between the parties for a plaintiff to maintain an action in tort against the alleged wrongdoer. *See id.* at 1303. Second, we determined that this Court would join "an emerging majority of jurisdictions [which] have taken the position that a contractor can maintain a negligence action against an architect without direct privity of contact between the parties." *Id.* (quoting *Detweiler Bros., Inc. v. John Graham & Co.,* 412 F.Supp. 416, 419 (E.D.Wash.1976)). (Alteration in original.) Here, however, the *Forte Brothers* case is of no help to the Nichols. Because the statute of repose bars the Nichols' tort claims, the only viable claims at issue in this case are those alleging breach of implied warranties. Such claims sound in contract, however, and thus are not tort claims like those involved in *Forte Brothers. See Boghossian v. Ferland Corp.,* 600 A.2d 288, 290 (R.I.1991).

Another case that sheds more light on this situation is *Davis v. New England Pest Control Co.*, 576 A.2d 1240 (R.I.1990). There, home buyers sued a pest-exterminating company hired by the sellers for negligently inspecting their home. Although reversing on other grounds, we upheld the Superior Court's ruling that an implied contractual obligation ran from the pest-exterminating company to the home buyers. We reasoned that when one party for valuable consideration engages another to act for the benefit of a foreseeable third party, that third party may maintain an action for breach of an implied contractual obligation to perform the job in a workmanlike manner. Indeed, we noted that:

> "[a]s a general rule there is implied in every contract for work or services a duty to perform it skillfully, carefully, and diligently and in a workmanlike manner, and a negligent failure to observe any of those conditions is a tort as well as a breach of contract." *Id.* at 1242.

Here, the Nichols argue that, like the plaintiffs in *Davis*, they too were foreseeable beneficiaries of the original contract and the implied warranties that arose from that contract. Although Beaufort never knew their identity nor communicated with them in any way, the Nichols claim that Beaufort should have foreseen that the Cronins were not likely to be the home's only owners during the ten-year-statute-of-repose period. Accordingly, the Nichols argue that, like the plaintiffs in *Davis*, they ought to be able to maintain an action for breach of implied warranties against the responsible home contractor despite their lack of contractual privity with this defendant. For the reasons discussed below, we are persuaded that the absence of contractual privity in these circumstances should not bar the Nichols' claims for breach of implied warranties.

Joining those "numerous jurisdictions [that] have now found privity of contract unnecessary for [maintaining a lawsuit based upon an] implied warranty," *Lempke v. Dagenais*, 130 N.H. 782, 547 A.2d 290, 293 (1988), this Court now holds that "the privity requirement should be abandoned in suits by subsequent purchasers [of homes] against a builder or contractor for breach of an implied warranty of good workmanship for latent defects." *Id.* at 294.[4] Our reasons for doing so are as follows:

(1) "To require privity between the contractor and the home owner in such a situation would defeat the purpose of the implied warranty of good workmanship and could leave innocent homeowners without a remedy ***." *Id.* (quoting *Aronsohn v. Mandara*, 98 N.J. 92, 484 A.2d 675, 680 (1984)).

(2) "The essence of implied warranty is to protect innocent buyers. As such, this principle, which protects first purchasers *** [*see Padula v. J.J. Deb–Cin Homes, Inc.*, 111 R.I. 29, 298 A.2d 529 (1973) ] is equally applicable to subsequent purchasers." *Lempke*, 547 A.2d at 294.

(3) "No reason has been presented to us whereby the original owner should have the benefits of an implied warranty [for] recovery *** and the next owner should not simply because there has been a transfer. Such intervening sales, standing by themselves, should not, by any standard of reasonableness, effect an end to an implied warranty or, in that matter, a right of recovery on any other ground, upon manifestation of a defect. The builder always has available the defense that the defects are not attributable to him." *Id.* (quoting *Moxley v. Laramie Builders, Inc.*, 600 P.2d 733, 736 (Wyo.1979)).

---

4. "In 1976, the Supreme Court of Indiana, [in *Barnes v. Mac Brown & Co.*, 264 Ind. 227, 342 N.E.2d 619 (1996) ], became the first court to extend the theory of implied warranty of habitability to subsequent purchasers of homes." Sean M. O'Brien, *Caveat Venditor: A Case for Granting Subsequent Purchasers a Cause of Action Against Builder–Vendors for Latent Defects in the Home*, 20 J.Corp.L. 525, 534 (1995) ("Currently, at least fourteen states extend the implied warranty of habitability to subsequent purchasers ."). Since then, the trend throughout the country has been to recognize a cause of action for subsequent home buyers against the builder of the home despite the lack of contractual privity between these parties. *See* Robert L. Cherry, Jr., *Builder Liability for Used Home Defects*, 18 Real Est.L.J. 115, 138 (1989) (noting that in the twelve years following Indiana's 1976 *Barnes* decision, seventeen jurisdictions had allowed a used-home buyer to sue a builder for defective construction based on implied warranty, negligence, and/or strict-liability theories).

(4) "[C]ommon experience teaches that latent defects in a house will not manifest themselves for a considerable period of time *** after the original purchaser has sold the property to a subsequent unsuspecting buyer." *Lempke*, 547 A.2d at 295 (quoting *Terlinde v. Neely*, 275 S.C. 395, 271 S.E.2d 768, 769 (1980)). (Second alteration in original.)

(5) "We are an increasingly mobile people; a builder-vendor should know that a house he builds might be resold within a relatively short period of time and should not expect that the warranty will be limited by the number of days that the original owner holds onto the property." *Lempke*, 547 A.2d at 295 (quoting *Redarowicz v. Ohlendorf*, 92 Ill.2d 171, 65 Ill.Dec. 411, 441 N.E.2d 324, 330 (1982)).

(6) "[L]ike an initial buyer, the subsequent purchaser has little opportunity to inspect and little experience and knowledge about construction." *Lempke*, 547 A.2d at 295. "Consumer protection demands that those who buy homes are entitled to rely on the skill of a builder and that the house is constructed so as to be reasonably fit for its intended use." *Id.* (quoting *Moxley*, 600 P.2d at 735).

▆▆▆▆ (7) Pursuant to *Padula* and *Boghossian*, home builders and contractors are already under a legal duty in this jurisdiction to construct habitable houses in a workmanlike manner. Moreover, following a new home's construction and sale, it is foreseeable that there may be more than one set of owners and inhabitants of the house during the ten-year-statute-of-repose period for the filing of tort claims against the builder. Given the existing contractual and implied-war-

ranty liability of home builders under *Padula* and *Boghossian* to the home's original owners—a liability that can extend well beyond the expiration of the ten-year-statute-of-repose period for the filing of tort claims [5]—allowing subsequent owners to maintain a similar cause of action (subject to their satisfaction of reasonable time limitations for doing so) will not drastically enlarge this basic obligation of the home builder. Thus, it is not unfair to the builder/contractor to extend the implied warranties of habitability and workmanlike quality to subsequent purchasers like the Nichols who not only discover latent defects in their home within ten years of the home's substantial completion, but who then file suit thereon within a reasonable period of time after discovering such defects.

(8) "[I]nterposing a first purchaser as a bar to recovery 'might encourage sham first sales to insulate builders from liability.'" *Lempke*, 547 A.2d at 295 (citing *Richards v. Powercraft Homes, Inc.*, 139 Ariz. 242, 678 P.2d 427, 430 (1984)). Here, Beaufort sold the house initially to the Cronins, who in turn resold it to the Nichols less than two years after Beaufort completed the home's construction. The mere fact that this initial transfer was a related-party sale (Mrs. Cronin was a first cousin of Beaufort) does not necessarily destroy its arms-length nature. But if implied warranties ended after the first sale, then unscrupulous builder-vendors, without much difficulty, could arrange for straw buyers or for transient, related-party sales as a means to limit their liability.

(9) "[B]y virtue of superior knowledge, skill, and experience in the construction of

---

**5.** In *Boghossian*, the builder-vendor substantially completed construction of a house for the initial-purchaser plaintiffs in 1973. Eight years later, the plaintiffs discovered structural defects in the house allegedly caused by the builder's improper preparation of the land. However, the plaintiffs did not file suit against the builder until nine years later in 1990—approximately seventeen years after the house's substantial completion. Notwithstanding the expiration of the ten-year-statute-of-repose period for the filing of tort claims, we held that an initial purchaser of improved residential real estate could maintain an action against the builder-vendor of such property for breach of the implied warranties of habitability and workmanlike quality. We so held be-

cause the applicable statute of repose, § 9–1–29, only barred untimely tort claims and thus did not preclude the plaintiffs' contract claims for breach of implied warranties. Rather, we applied § 9–1–13, the general statute of limitations for civil actions, and concluded that the plaintiffs' suit was not time barred because their cause of action for breach of implied warranties did not accrue until the plaintiffs first became aware of the home's latent defects. As a result, the potential liability of builders, architects, professional engineers, and other home contractors to the home's original owners for alleged faulty work can extend far beyond the expiration of the ten-year-claims-filing period set forth in the tort statute of repose.

houses, a builder-vendor is generally better positioned than the purchaser to *** evaluate and guard against the financial risk posed by a [latent defect] ***." *Lempke,* 547 A.2d at 295 (quoting *George v. Veach,* 67 N.C.App. 674, 313 S.E.2d 920, 923 (1984)). (Alteration in original.) Thus, allowing subsequent owners to sue builder-vendors recognizes that, as a society, we have evolved from an era when caveat emptor ruled the legal world to one where, at least in consumer transactions, caveat venditor is the heir apparent to this crown.

(10) "Not only do policy and economic reasons convince us that a privity requirement in this situation is unwarranted, but analogous situations show us the soundness of this extension. Public policy has compelled a change in the law of personal property and goods, as witnessed by the adoption of the UCC. The logic which compelled this change is equally persuasive for real property." *Lempke,* 547 A.2d at 295.

(11) Although the ten-year-tort-statute-of-repose period expired before the Nichols filed this action, this time limitation is simply inapplicable to contract-based breach-of-implied-warranty claims. *See Boghossian,* 600 A.2d at 290.[6] Thus, we would be rewriting this legislation if we interpreted the tort statute of repose to bar not only tort claims, but breach-of-implied-warranty claims as well. *See Paradis v. Heritage Loan and Investment Co.,* 678 A.2d 440, 443 (R.I.1996) (noting that it is not the Court's function to rewrite legislation). We refused to do so when the original owners in *Boghossian* brought breach-of-implied-warranty claims against the builder of their house approximately seven years after the expiration of the ten-year-statute-of-repose period for filing any tort claims against this builder, and we refuse to do so now. Hence, we conclude

that our reasoning in *Boghossian* supports the recognition of an implied-warranty cause of action in favor of the subsequent owners in this case.

## III

### Limitations on Breach–of–Implied–Warranty Claims Filed by Subsequent Owners

■ In allowing purchasers who are not in privity with the builder-vendor of a house to hold such a party responsible for economic damages caused by the home's latent defects, we recognize that some limitations must be imposed on the scope of this otherwise potentially unlimited liability. "As with any rule, there must be built-in limitations, which in this case would act as a barrier to the possibility of unlimited liability. Therefore, our extension of the implied warranty of workmanlike quality is not unlimited; it does not force the builder to act as an insurer, in all respects, to a subsequent purchaser." *Lempke,* 547 A.2d at 297. Thus, we limit the extension of implied-warranty liability to home buyers who are not in privity with the builder to *latent* defects existing at the time of the home's original sale that were not known to or were not reasonably discoverable by the buyer when he or she purchased the house, and "which become manifest after the subsequent owner's purchase and which were not discoverable had a reasonable inspection of the structure been made prior to the purchase." *Id.* (quoting *Richards,* 678 P.2d at 430).

■ Second, to avoid exposing builders, architects, engineers, and other home contractors to the specter of a virtually unlimited period of potential liability, we restrict the coverage of the implied warranties of habitability and of workmanlike quality to

---

6. We acknowledge that "[t]here has been much judicial debate on the basis of implied warranty. Some courts find that it is premised on tort concepts. *** Other courts find that implied warranty is based in contract. *** Other authorities find implied warranty neither a tort nor a contract concept, but 'a freak hybrid born of the illicit intercourse of tort and contract. *** Originally sounding in tort, yet arising out of the warrantor's consent to be bound, it later ceased necessarily to be consensual, and at the same

time came to lie mainly in contract.' " *Lempke v. Dagenais,* 130 N.H. 782, 547 A.2d 290, 292 (1988) (quoting Prosser, *The Assault Upon the Citadel,* 69 Yale L.J. 1099, 1126 (1960)). Despite this questionable lineage for a cause of action based upon the breach of implied warranties of habitability and workmanlike quality, we have opted to characterize such claims as sounding mainly "in breach of contract." *Boghossian,* 600 A.2d at 290.

those latent defects that subsequent owners discover within a reasonable period of time after these home contractors have substantially completed their work on the improvement at issue. Informed by the ten-year repose period established by § 9–1–29 for tort claims, we deem a period of ten years after substantial completion of the improvement in question to be a reasonable period of time within which subsequent owners should be able to discover any latent defects in the home for their implied-warranty claims to be actionable. In this case, the Nichols discovered the latent defects during the ten-year period after Beaufort had substantially completed the construction of the house. Although "[t]he length of time for latent defects to surface, so as to place subsequent purchasers on equal footing should be controlled by the standard of reasonableness and not an arbitrary time limit created by the court," *id.* (quoting *Terlinde,* 271 S.E.2d at 769), we do not believe it would be arbitrary to hold the builder responsible for latent defects that subsequent buyers of the home discover within the ten-year-statute-of-repose period for tort claims and then sue upon thereafter within a reasonable time frame. Given the existing three-year statute of limitations for malpractice suits filed against, inter alia, real-estate agents, *see* § 9–1–14.1,[7] and given the close similarities between such malpractice claims and those alleging a breach of the builder's implied warranties of habitability and workmanlike quality,[8] we are of the opinion that such claims have been timely filed when subsequent owners initiate breach-of-implied-war-

ranty claims, as here, within three years of the date when they discover any latent defects or within three years of the date when, in the exercise of due diligence, they should have discovered such defects. *Compare Boghossian v. Ferland Corp.,* 600 A.2d 288 (R.I. 1991) (allowing original owners in privity of contract with the builder to sue the builder for latent defects based upon an alleged breach of implied warranties despite the expiration of the ten-year-tort-statute-of-repose period, but within the ten-year limitations period for contract actions) *with* § 9–1–14.1 (establishing three years from the date of discovery—or from the date when such malpractice, in the exercise of reasonable diligence, should have been discovered—as the applicable statute of limitations for malpractice claims against real-estate agents).

■ Finally, the subsequent-owner plaintiffs have the burden to show that the builder's faulty workmanship caused any latent defects. Such claims also shall be subject to whatever other defenses the builder may have, including, for example, "that the defects were not attributable to him, that they are the result of age or ordinary wear and tear, or that previous owners have made substantial changes ." *Lempke,* 547 A.2d at 297 (quoting *Richards,* 678 P.2d at 430).

### Conclusion

For these reasons, the plaintiffs' appeal is sustained in part and denied in part. We reverse and vacate the Superior Court's summary judgment that entered in favor of Beaufort with respect to the Nichols' breach-

---

7. Section 9–1–14.1 states, in relevant part:

"Notwithstanding the provisions of §§ 9–1–13 and 9–1–14, an action for medical, veterinarian, accounting, or insurance or ·real estate agent or broker malpractice shall be commenced within three (3) years from the time of the occurrence of the incident which gave rise to the action; provided, however, that:

\*\*\*

(2) In respect to those injuries or damages due to acts of \*\*\* [such] malpractice which could not in the exercise of reasonable diligence be discoverable at the time of the occurrence of the incident which gave rise to the action, suit shall be commenced within three (3) years of the time that the act or acts of the malpractice should, in the exercise of reasonable diligence, have been discovered."

8. "There are close similarities between professional malpractice suits, in which the discovery rule is generally applied, and express and implied warranty cases. Malpractice actions are premised on an implied contract to use the standard of care reasonably expected from a professional. Negligent breach of that standard of care gives rise to a cause of action. We believe that a buyer has a similar right to rely on the warranty of the seller of a product or service. In the area of malpractice this very reliance underlies the reason for the application of the discovery rule. \*\*\* In express or implied warranty situations the buyer is in a position of inferior knowledge similar to that of a client or patient in the cases of professional malpractice." *Brown v. Ellison,* 304 N.W.2d 197, 201 (Iowa 1981).

of-implied-warranty claims. However, we affirm the Superior Court's grant of summary judgment with respect to the Nichols' negligence claims. Accordingly, we remand the papers in this case to the Superior Court for entry of an amended partial summary judgment, for amendment of pleadings to delete the Nichols' tort claims, and for further proceedings consistent with this opinion.