DECISION
These consolidated administrative appeals were taken by a homeowner, Robert Ruginis, and a contractor, Carl Benevides, from a July 9, 1998 decision of the Rhode Island Contractors' Registration Board which adjudicated the homeowner's claims against the contractor for deficiencies in the construction of a new residential dwelling. In that decision, the Board required the contractor, Carl Benevides, to strip the exterior paint on a home that he had built and sold to the homeowners, Robert and Kathleen Ruginis. In all other respects, the Board denied the homeowner's claims.
The contractor appeals from that portion of the Board's decision which requires him to strip the exterior paint on the home. The homeowner appeals from that portion of the Board's decision which requires him to paint the exterior of the home after it is stripped by the contractor, arguing that the contractor should be required to strip and paint the home, and from the Board's denial of his other claimed deficiencies, namely cracked kitchen grout, a leaking basement window and a flaking basement floor.
This Court has jurisdiction of these appeals pursuant to G.L. 1956 § 42-35-15(g). For the reasons set forth in this decision, the Board's decision is reversed in part and affirmed in part.
 Factual Background and Procedural History
On June 20, 1996, Robert A. Ruginis and his spouse, Kathleen E. Ruginis (the "Buyer"), entered into a Purchase and Sale Agreement (the "Agreement") with a builder/vendor, Carl F. Benevides (the "Contractor"), to purchase for $335,000 a new home located at 176 Poppasquash Road in Bristol, Rhode Island that had been constructed by the Contractor. (Ex. 1.) The Agreement contained an Addendum which provided for additional obligations of the Contractor and the right of the Buyer to an additional inspection after completion of any of the Contractors' obligations that were not finished as of the date of the original inspection. The Addendum also stated that the Contractor would provide the Buyer with a one (1) year builder's warranty upon closing. (Ex. 1.) After an inspection on July 10, 1996, the Contractor agreed, by letter to the Buyer, to repair numerous additional items prior to the closing. (Ex. 3.) The Contractor specifically agreed to remedy "bubbles in paint on exterior" (Item 1). Id. Pursuant to this agreement, the contractor made certain repairs to attempt to alleviate the problem with paint bubbles on the exterior of the home. The closing on the house took place on August 16, 1996. Funds were not held in escrow, and no additional written warranties were provided at the closing.
According to the Contractor, he built the house "possibly two years before it was sold." The certificate of occupancy, according to the Contractor, issued just prior to the closing. He said he painted the house "about 1 1/2 years before selling, as soon as [he] could."
On September 9, 1996, the Buyer sent a letter to the Contractor regarding additional problems with the house that emerged after the closing, including a basement window leak, grout cracking in the kitchen, and continued problems with paint bubbles on the exterior of the house. (Ex. 6.) The Buyer sent numerous additional letters to the Contractor between September 20, 1996 and August 5, 1997, stating that there were various problems with the house and requesting a time when the Contractor would be making the necessary repairs. (Exs. 7-13.) The letters indicated, and the Buyer testified, that the Contractor continued to agree to make certain repairs, including fixing the paint bubbles, the cracked grout in the kitchen, and the leaking window well in the basement. Id. On August 7, 1997, the Contractor reversed his position and advised the Buyer by letter that the house was sold "as is," that he was not responsible for any problems with the house unless they concerned the roof, plumbing, heating or electrical matters, and that he had only made repairs previously as a gesture of good faith. (Ex. 14.) The Contractor took the position that the Buyer had received such a good deal on the purchase price of the house that any further necessary repairs should be funded out of those savings by the Buyer.
On August 14, 1997, the Buyer filed a Statement of Claim against the Contractor with the Board for negligent and improper work and breach of contract.[1] The Buyer complained about four separate deficiencies: 1) bubbles in the paint existing on four sides of the exterior of the home (Item 1); 2) a basement window well that fills with water and leaks into the basement (Item 2); 3) kitchen floor grout that is cracked and pieces of grout that are falling out (Item 3); and 4) a basement floor that is continually flaking (Item 4). Along with the claim, the Buyer filed: 1) the Agreement; 2) the letter dated July 14, 1996 from the Contractor to the Buyer listing the items to be repaired before the closing; 3) the closing settlement statement; 4) correspondence from the Buyer to the Contractor on diverse dates from September 9, 1996 through August 15, 1997; and 4) a videotape depicting the alleged problems with the property. The Board assigned an investigator to go to the property and investigate the Buyer's claims. The investigator filed a report with the Board dated November 18, 1997, finding blisters in the paint on four sides of the exterior of the home, referencing the videotape showing leaks in the basement area, finding cracks in the kitchen floor grout and pieces falling away and finding no loose aggregate in the basement floor. The investigator determined that Item 4 (basement floor) was not a deficiency, that Item 3 (kitchen floor grout) was a deficiency, and that Item 2 (window well leak) could be a deficiency. He took no concrete position regarding Item 1 (exterior paint).
A hearing officer conducted administrative hearings on the Buyer's Statement of Claim on February 18, 1998 and April 7, 1998. The hearing officer took testimony from the Buyer and the Contractor. The hearing officer also took judicial notice of the investigator's report and reviewed the Buyer's videotape of the alleged deficiencies in the house. On April 21, 1998, the hearing officer rendered Findings of Fact, Conclusions of Law, and a Proposed Order. The hearing officer found that there was no flaking in the basement floor and thus no deficiency as to Item 4. He found that the cracks in the kitchen floor grout were not deficiencies, because the contractor is only obligated, under the Board's regulations, to make a one-time repair of such a problem which he fulfilled. The hearing officer found further, with regard to Item 2, that there was a deficiency connected to the leaking window well. As to Item 4, the bubbling paint on the exterior, the hearing officer found the condition to exist but determined it was not a deficiency because the Contractor addressed the problem once and there is no obligation, under the Board's regulations, to repair a paint problem that occurs later than one year after construction of the house. The hearing officer thus issued a Proposed Order that denied the Buyer's claims regarding the exterior paint, the kitchen grout, and the basement floor and ordered only that the Contractor "make the necessary repairs to the basement window to relieve the entrance of water into the basement." The Proposed Order required those repairs to be made within twenty (20) days, with a thirty (30) day license suspension and other possible penalties to be imposed for noncompliance.
The Buyer filed timely exceptions to the Proposed Order. The Board held a non-evidentiary hearing to review the hearing officer's decision on June 11, 1998. On July 13, 1998, the Board issued its Findings of Fact and Conclusions of Law which essentially parroted the hearing officer's decision. It also issued a Final Order modifying the hearing officer's Proposed Order. The Board ordered the Contractor to return to the Buyer's property within 60 days and to remove the existing finish from the house, excluding the trim. The sixty (60) day period was designed to ensure that the paint was removed before the seasons changed. The Final Order dictated that the Buyer, upon completion of this stripping work by the Contractor, would be responsible for the painting and priming of those exposed surfaces. The Board further ordered that, if the Contractor failed to comply with the terms of the Final Order, his license would be suspended until completion of the work and a $500 fine would be imposed.
The Final Order, unlike the Proposed Order, did not require the Contractor to fix the basement window, even though the Contractor acknowledged this deficiency and agreed to remedy it. While the Final Order does not explicitly reverse the hearing officer's decision with regard to the window well leak, such a reversal may be implied from the absence of any mention of the window well in the Final Order and a review of the hearing record regarding the window well leak. That record reveals the following colloquy between the Buyer's attorney and the Chairman of the Board:
 Atty: What about the window?
 Chair: It's a heavy burden to make the contractor strip [the paint] instead of just fix and repair. [The Contractor is] taking a big labor hit — therefore the homeowner must be responsible for the window.
 Atty: How can you do that when the window issue wasn't before you?
 Chair: [No answer appears on tape.]
The Buyer and the Contractor each timely filed appeals from the Final Order of the Board to this Court. Those appeals have been consolidated for decision.
 Standard of Review
The review of a decision of the Board by this Court is controlled by G.L. 1956 § 42-35-15(g) which provides for review of a contested agency decision:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
When reviewing an order of an agency, this Court lacks the authority to assess witness credibility or to substitute its judgment for that of the agency concerning the weight of the evidence on questions of fact. Costa v. Registry of MotorVehicles, 543 A.2d 1307, 1309 (R.I. 1988). This Court's review, therefore, is limited to determining whether substantial evidence exists in the record to support the Board's decision. NewportShipyard v. Rhode Island Comm'n for Human Rights, 484 A.2d 893
(R.I. 1984). Substantial evidence is that which a reasonable mind might accept to support a conclusion. Id. at 897 (citing Caswellv. George Sherman Sand and Gravel Co., 424 A.2d 646, 647 (1981)). The Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal ResourcesManagement Council, 434 A.2d 266, 272 (R.I. 1981). The determination of questions of law, however, are not binding upon a reviewing court and may be reviewed freely to define the law and decide its applicability to the facts of the case. Carmody v.R.I. Conflict of Interest Comm'n, 509 A.2d 1307, 1309 (R.I. 1988).
The Board is an administrative agency, the duties and powers of which are derived from Title 5, Chapter 65 of the Rhode Island General Laws. Under the Board's regulations, the Board's review of exceptions to a proposed order is limited to evidence received at the hearing, exceptions filed to the proposed order, and written and oral argument relative to the proposed order. See 01 030 CRIR 001 Rule 5.1(7). The Board may not consider new or additional evidence. Id. Board review is confined to the record compiled during the underlying administrative proceeding.Environmental Scientific Corp. v. Durfee, 621 A.2d 200, 204 (R.I. 1993).
 The Legal Framework
For problems that arise with a newly built home after the closing, a buyer is not without recourse as against a builder/vendor. In Padula v. J. J. Deb-Cin Homes Inc., the Rhode Island Supreme Court held that "where there is a sale of a new house by a vendor who is also the builder thereof, there is an implied warranty of reasonable workmanship and habitability surviving the delivery of the deed." 111 R.I. 29, 298 A.2d 529, 532 (1973). The Court determined that it would be manifest injustice to apply the ancient common-law rule of caveat emptor to an inexperienced buyer in favor of a builder who is daily engaged in the business of building and selling new houses. Id. at 531.
In 1974, the Court extended the doctrine of implied warranty to subsequent purchasers, even where there was an intervening one year tenancy, holding that the house was still relatively new and that it was not unreasonable to hold the builder liable under a theory of implied warranty. Casavant v. Campopiano, 114 R.I. 24,327 A.2d 831 (1974). Recently, our Supreme Court held that the implied warranty of habitability and workmanlike quality extended to subsequent purchasers of the property, applying to latent defects existing at the time of the home's original sale that were not known to, nor reasonably discoverable by, the buyer when he purchased the house. Nichols v. R.R. Beaufort Assoc.,727 A.2d 174 (R.I. 1999). The Court stated that "the thrust of the [implied warranty] cases was to afford protection to new home buyers from any latently defective work and possible overreaching by knowledgeable builders-vendors." Id. at 177. The Court inNichols noted that the potential liability for latent defects of a builder or contractor can extend well beyond the ten (10) year statute of limitations for civil actions, as the limitation begins to run when defects are, or should have been, discovered by the homeowner. Id. at 182.
Mindful of Padula and its progeny concerning the doctrine of the implied warranty of reasonable workmanship and habitability applicable to builder/vendors, the General Assembly enacted the Contractors' Registration Act ("the "Act"). R.I. Gen. Laws §5-65-1 et. seq. (1989). It requires contractors to be registered appropriately. Id. §§ 5-65-1 through 5-65-9. It also creates the Contractors' Registration Board as an administrative body to address certain claims for damages that homeowners have against registered contractors. Id. § 5-65-11.
The Board is empowered specifically to hear claims that a homeowner files against a contractor for negligent or improper work and breach of contract. Id. § 5-65-11(1). "If the owner of a new structure files [such a] claim, the Board must receive the claim not later than one year after the date the structure was first occupied as determined from the date of issuance of the certificate of occupancy, or one (1) year after the date of the closing on the structure, whichever shall later occur." Id. §5-65-12(c)(1).[2] "Any corrective work performed to resolve a claim will be the responsibility of the contractor for one year beyond the completion date but only for corrective work performed." Id. § 5-65-12(c)(7).
The Board may refuse to accept or process a claim if it has been submitted to a court or other entity authorized by law or the parties to resolve the claim. Id. § 5-65-12(b)(1). Upon acceptance of a claim, the Board shall proceed to investigate and hear the claim pursuant to the Administrative Procedures Act and its own regulations. Id. §§ 5-65-12 and 5-65-20.
The Board's regulations prescribe the minimum acceptable performance standards required of contractors; compliance with those standards establishes qualified workmanship and non-negligent work under the Act. See generally State of Rhode Island Administrative Regulations and Construction Standards of the Contractors' Registration Board, 01 030 CRIR 001 (the Regulations"). The Regulations "shall be liberally construed and shall be held to be in addition to, and not in substitution for, or a limitation of, the provisions of any other regulation or law." Id. at Rule 6.3.
The clear intent of the Act, therefore, is to provide homeowners with an expeditious administrative forum in which they may redress problems they claim they have had with their contractors. It is a consumer protection statute designed to regulate builders and protect homeowners. See Gould v. RhodeIsland Bldg. Contractors' Bd., WC 91-753 (Apr. 7, 1995) (Goldberg, J.).
The Board's jurisdiction, however, is limited. With regard to new construction, it is designed to address only those problems that emerge within one year of the later of the issuance of a certificate of occupancy or the closing date. Id. § 5-65-12
(c)(1). To the extent the contractor performs work to address such a claim, the Board can address problems with the corrective work that emerges within one year of the date of completion of that work. Id. § 5-65-12(c)(7).
Under this authority, a builder/vendor can be held liable based on a theory of implied warranty and pursuant to the Act for unreasonable workmanship in the construction of a new home that he or she sells when those problems manifest themselves within the later of a year after the closing or issuance of a certificate of occupancy. The builder/vendor cannot avoid liability for such problems by selling the house "as is" or by failing to extend to the homeowner certain express warranties with regard to the house.
As such, it matters not in this case whether the Contractor sold the house to the Buyer "as is." It likewise matters not whether he extended to the Buyer any express warranties. The Contractor is liable to the Buyer, pursuant to the Act and the Regulations, for deficiencies in the construction of the residence that emerge within the later of one year after the date of closing or issuance of a certificate of occupancy.
The Contractor contends that the one year period of liability runs not from the date of closing or issuance of a certificate of occupancy but from the date the work is completed. Such an interpretation of the Act would fly in the face of its plain language, the Regulations, the case law regarding implied warranties governing builder/vendors and the express builder's warranty that the Contractor extended to the Buyer in this case.
If a contractor were liable for a deficiency in new home construction for only one year from the date of completion of the work in question, the Act's provision that a homeowner may file a claim regarding such work within one year from the date of the closing or date of issuance of a certificate of occupancy would be rendered a nullity as to any work completed prior to one year before the closing or issuance date. In addition, such a construction of the Act would in effect rewrite the Act's provisions regarding new construction and improperly substitute therefor the provisions regarding existing dwellings. Cf. R.I. Gen. Laws § 5-65-12(c)(1) (giving the homeowner one year from closing to file claims with the Board) with §5-65-12(c)(2) (giving the homeowner one year from the date of completion of the work to file claim with the Board).
The Regulations define certain construction deficiencies, frequently making reference to conditions that manifest themselves "during the first year." See, e.g., Rules 6.0(h)(2)(b)(2) (cracks in tile joints) and 6.0(h)(6)(b)(1) (exterior paint). That phrase is not used exclusively, as the Contractor suggests, to indicate one year from the time the work is performed but is left vague to be able to track the two separate one year periods referenced in the Act, see R.I. Gen. Laws §§ 5-65-12(c)(1) and 5-65-12(c)(2), that vary depending on whether the construction is connected with a new or existing dwelling.
To interpret the Act and Regulations as requiring new construction to be free from deficiencies only for one year following completion of the work in question would defeat the consumer protection purposes of the Act. A builder/vendor would need only wait for one year following completion of the work in question to sell the house to avoid liability for any deficiencies in that work under the Act. The purpose of the Act, implicitly recognized by the Board in its decision in this case, is to require builder/vendors who sell a house as "new" to stand behind the workmanship on the house for a minimum of one year after the sale, regardless of when the work was performed. To that extent, the doctrine of implied warranty of reasonable workmanship and habitability as to the sale of a new home by a builder/vendor, which clearly extends beyond the delivery of the deed and for at least a period of one year thereafter, is codified in the Act and can be administratively enforced. SeePadula, 298 A.2d at 531-32.
Moreover, in this case, the Contractor agreed in the purchase and sale agreement to give the Buyer a one year builder's warranty upon closing. A one year builder's warranty is recognized in the trade as the one year implied warranty of reasonable workmanship and habitability codified in the Act. It is disingenuous, in light of that promise to convey such a warranty, for the Contractor to now take the position that any implied warranty under the Act runs from the date the work in question is completed and not from the date of closing. In agreeing to give that warranty, the Contractor recognized that his obligation under the Act is to correct any deficiencies in the construction of the Buyer's residence that emerge within one year after occupancy or closing, regardless of when the work that is the subject of the deficiency was performed.
This Court must proceed, therefore, mindful of these legal precepts, to analyze the Board's decision with respect to the Buyer's claimed deficiencies. Each of the claimed deficiencies will be addressed seriatim.
 The Claimed Deficiencies A. Exterior Paint
In its decision, the Board found that the exterior paint bubbled during the first year after the closing. The Board held that the Contractor need only be responsible for stripping the existing paint and that the Buyer should be responsible for repainting the house. (Ex. 6, Final Order). The Buyer contends that the Contractor should be responsible for repainting the house. The Contractor argues that he addressed any problems with the exterior paint and that he should not be responsible for stripping the existing paint or for any further defects in the exterior paint.
The Regulations state, and the Board agrees, that exterior paint peeling or bubbling is a deficiency if it occurs during the first year. See Rule 6.0(h)(6)(b)(1); Def. Mem. at 7-8. As previously noted, that one year provision extends for a year following the later of the closing or issuance of a certificate of occupancy on a new residence. Under the Regulations, a contractor will be exempt from performing future repairs only if the Board determines that the paint condition has been repaired in strict conformance with manufacturer's specifications. See
Rule 6.0(h)(b)(3).
At the hearing, the Buyer testified that during the first year after closing, the exterior paint was bubbling and peeling. The Board investigator's report, performed only two (2) months after the claim was filed, indicates that the exterior paint on all four sides of the house was blistering. A videotape admitted into evidence and taken during the first year after closing shows multiple portions of the paint bubbling. The record also contains testimony by the Contractor that he returned to the house after the closing and could not see any problems with the paint.
The Board found that the exterior paint did bubble and peel during the first year after the closing. It is clear from the Buyer's testimony and the videotape introduced into evidence at the hearing, even considering the Contractor's contrary testimony, that this finding is supported by the substantial evidence of the record. Pursuant to the Regulations, the exterior paint on the house is a deficiency which the Contractor is required to repair in strict conformance with manufacturer's specifications.
Notwithstanding this finding of a deficiency, the Contractor argues that he repaired portions of bubbling exterior paint such that he has satisfied the one time repair requirement of the Regulations. Any repairs to the paint that the Contractor performed, however, were done prior to the closing. As such, those repairs do not satisfy the minimum requirements of the Act and the Regulations by which the Contractor is held responsible for deficiencies occurring during the first year after closing. In addition, it would be absurd to interpret the Regulations to mean that where a contractor or painter repairs a portion of the exterior paint on a house during the first year, that if the same or different areas of the paint begin to bubble within that first year, then the contractor would be relieved of any duty to repair those sections of the exterior paint. The purpose of the Act and the Regulations is to remedy deficiencies. As the paint deficiencies persisted after the supposed attempt to remedy them and as there is no evidence that any repairs that were made complied strictly with manufacturer's specifications, the Contractor cannot be relieved of his obligation to remediate the paint problem.
The next question is whether, in light of this found deficiency in the paint, the Contractor can fulfill his duty of repair by stripping, but not repainting, the exterior walls of the home, as ordered by the Board. The Board found that because the house had been painted more than one year prior to the closing, the Contractor should be required only to strip the existing exterior paint and not to repaint the house. It also relieved the Contractor of a duty to repaint the house based on the age and selling price of the house. The Board took into account that the house was three (3) years old at the time of the closing. The Board also considered the fact that the house was sold at a reduction of $100,000.00 off its original market price.
Under the Act, once a violation of a Regulation is found by the Board, "the [B]oard shall recommend to the [Buyer] such action as the [B]oard considers appropriate . . . to compensate the [Buyer] for any damages incurred as a result of the violation." R.I. Gen. Laws § 5-65-12(d). The intent of the Act is to make the Buyer whole with regard to a found deficiency. With regard to an exterior paint deficiency, the Regulations exempt a contractor from performing future repairs only if the repair has been made "in strict accordance with manufacturer's specifications." See Rule 6.0(h)(6)(b)(3). It necessarily follows, therefore, that a contractor must remedy an exterior paint job that is found to be deficient under the Regulations by repairing the work in strict accordance with manufacturer's specifications.
By ordering the Contractor to strip the exterior walls of the house, the Board implicitly determined that he had a repair obligation that had not been fulfilled by previous repair work done and that such a deficiency only could be remedied by stripping and repainting the house. The Board had no authority under the Act and the Regulations to relieve the Contractor of a portion of that responsibility.
Even assuming the Board has the discretion to craft a remedy for a found violation that relieves the Contractor of the entire burden of repair, the record in this case suggests that the Board lacked evidentiary support for its decision in that regard. First, the Board was clearly erroneous with regard to its finding as to the age of the house. It found that the house was three (3) years old at the time of the closing, notwithstanding the Contractor's contrary testimony that it was two (2) years old at the time of closing and that the paint was applied approximately one and one-half (1 1/2) years before the closing. More importantly, the age of the house is irrelevant because the Contractor, as a builder/vendor, sold the house as new and impliedly warranted that the exterior paint would not bubble or be deficient for at least one year following the closing, regardless of the date that the paint was applied.
Second, the Board also clearly erred in finding that the Buyer received a purchase price reduction from the contractor. There is no evidence in the record that the Buyer bargained for or received a discount on the purchase price. The Contractor first raised the issue of a reduction in the selling price, as distinguished from a discounted purchase price, impermissibly at the non-evidentiary Board hearing as evidence outside the record.[3] There was simply no evidence before the Board to suggest that the Buyer received a discount on the purchase price of the house based on the age of the house or its paint or otherwise.
Accordingly, that portion of the Final Order which requires the Contractor to strip the house is affirmed as it is supported by the law and the substantial evidence of record. That portion of the Final Order which relieves the Contractor of the duty to repaint the house after stripping it is reversed, as it contravenes the law and the evidence and constitutes an abuse of any discretion that the Board may be found to have in fashioning remedies for deficiencies under the Act.
 Cracked Kitchen Tile Grout
Additionally, the Buyer argues that the Board erred in affirming the hearing officer's finding that the Contractor satisfied the Regulations regarding cracked kitchen grout. Specifically, the Buyer argues that the Contractor's attempts to regrout the kitchen tile and the subsequent cracking of the same grout cannot satisfy the Regulations. The Board found that the Contractor had attempted to repair the grout within the meaning of the Regulations.
The Regulations state that cracks in grouting of tile joints are a deficiency. See Rule 6.0(h)(2)(b). The Regulations state further that the contractor will, one time only, during the one year period repair any such cracks. Id. "Repair" means to restore to a sound or good condition after decay, injury, dilapidation, or partial destruction. Black's Law Dictionary 1298 (6th ed. 1990). Furthermore, the enabling legislation governing the Contractors' Registration Board requires that "any corrective work performed to resolve a claim is the responsibility of the contractor for one (1) year beyond the completion date but only for corrective work performed." G.L. 1956 § 5-65-12(c)(7).
Here, however, not only did additional cracks appear in the kitchen grout during the year following the closing, but also portions of grout that the Contractor had attempted to repair prior thereto cracked again during that first year. Under the Act and the Regulations, the Contractor would be responsible for all deficiencies that occurred during the year following the closing, regardless of previous repairs performed. Even assuming the repair work could be classified as "corrective work performed to resolve a claim" under § 5-65-12(c)(7), the Contractor still would be liable for defects in that corrective work for a year thereafter.
Accordingly, the Board's determination that the Contractor complied with the Regulations requiring repair of cracked grouting is legally incorrect and not supported by the reliable, probative, and substantial evidence of the record. To the extent the Final Order relieves the Contractor of his duty to repair the cracked grouting, therefore, it is hereby reversed.
 Basement Window Leak
The Buyer next argues that the Board was clearly erroneous in reversing the decision of the hearing officer requiring that the Contractor repair the basement window leak. In the Proposed Order, the hearing officer, after concluding that the leaking window was a deficiency, proposed to the Board that the Contractor be required to make the necessary repairs to the basement window to prevent water from entering into the basement.
There is no dispute by the parties that the window leaks. Both the Contractor and Buyer testified that when there is a heavy rain, the basement window well floods and water leaks into the basement. The Contractor conceded in his testimony at the hearing that the window is a deficiency and needs to be fixed. Although the investigator was unable to verify the leak at the time of his inspection, the videotape admitted into evidence clearly shows water leaking through the walls, and the investigator concluded that this would be a deficiency that the Contractor would be required to correct according to Regulations.See Rule 6.0(f)(1)(a).
The Board is required, as the ultimate administrative decision maker, to be detached from reversing or modifying a hearing officer's factual findings. See Environmental ScientificCorp. v. Durfee, 621 A.2d 200 (R.I. 1993). The administrative structure also requires that any rejection of a hearing officer's findings be grounded upon an adequate rationale. Id.
In the present case, the Board did not explicitly reject the hearing officer's finding that the leaking window was a deficiency. It nonetheless relieved the Contractor of the responsibility for remedying that problem based only on the Board Chairman's taped comment that it was the best he could come up with due to the expense that the Contractor would incur in stripping the existing exterior paint. The Board's decision in this regard is patently arbitrary, legally incorrect, unsupported by the evidence and a gross abuse of discretion. To the extent the Board's decision relieves the Contractor of the duty to repair the basement window, therefore, it is reversed.
 Flaking Basement Floor
Finally, the Buyer argues that the Board erred in affirming the hearing officer's finding that there is no deficiency regarding the basement floor. The Contractor concurs with the Board's finding.
The Regulations state that "concrete surfaces shall not disintegrate to the extent that the aggregate is exposed and loosened under normal conditions." See Rule 6.0(c)(1)(g). The Buyer testified that he observed little pebbles on the basement floor and that if the floor is rubbed, little stones are loosened. The investigator examined the floor and determined that no aggregate was visible and, therefore, there was no deficiency. The hearing officer and the Board relied on the investigator's report in this regard to make a finding of no deficiency. In so doing, they implicitly rejected the Buyer's contrary testimony.
This Court lacks the authority to assess witness credibility.Costa, 543 A.2d at 1309. As such, there is sufficient evidence in the record to support the hearing officer's finding, as adopted by the Board, that there was no deficiency concerning the basement floor. This Court cannot conclude that such a finding is clearly erroneous. Accordingly, the Board's denial of the Buyer's claim of negligence or improper work connected with this item must be affirmed.
 Conclusion
After review of the entire record, including the tapes of the initial hearing and the subsequent Board hearing, this Court finds, for the reasons stated in this decision, that the decision of the Board should be reversed in part and affirmed in part. That portion of the Board's decision which requires the Contractor only to strip the exterior paint but not to repaint the house is reversed. That portion of the Board's decision finding no deficiency in the cracked kitchen grout is likewise reversed. To the extent that the decision finds no deficiency with respect to the leaking basement window and relieves the Contractor of the responsibility to repair that deficiency, it also is reversed. The Board's determination that there is no deficiency regarding the basement floor is affirmed.
Based on this Court's decision, the Final Order of the Board is vacated. The Contractor is ordered to return to the house in question and to proceed forthwith to strip and repaint the four exterior walls, repair the kitchen grout and repair the leaking basement window, in accordance with any relevant manufacturer's specifications and the Regulations of the Board. As originally dictated by the Board in its Final Order, if the Contractor fails to comply with the Order of this Court, his license shall be suspended until completion of the work and a $500 fine shall be imposed.
Accordingly, the Contractor's appeal is denied. The Buyer's appeal is sustained in part and denied in part. These consolidated cases are remanded to the Board for further action consistent with this decision.
Counsel shall submit an agreed upon form of order and judgment forthwith for entry by this Court.
[1] The Statement of Claim which the hearing officer issued in his Proposed Order, the Statement of Claim the Board issued in its Final Order, and the brief submitted to this Court by the Attorney General all state that the Buyer filed its Statement of Claim with the Board on September 9, 1997. The Statement of Claim is dated and date stamped as having been received by the Board on August 14, 1997, however, and thus is within the one year statutory filing requirement of G.L. § 5-65-12(c)(1).
[2] This provision stands in contrast to the provision governing an existing, as opposed to a new, structure. A claim regarding an existing structure must be received by the Board "not later than one year after the date the work was substantially completed as determined by the certificate of occupancy, or the date the work ceased." RI. Gen. Laws §5-65-12(c)(2).
[3] Under its own Regulations, it is improper for the Board to consider new evidence at this hearing. See Rule 5.1(7).