RICHARD F. ARONSOHN AND DEBORAH ARONSOHN, PLAIN-
TIFFS-APPELLANTS, v. SALVATORE MANDARA AND WIL-
LIAM S. MANDARA MASONRY CORPORATION, DEFEND-
ANTS-RESPONDENTS.

Argued April 30, 1984—Decided December 12, 1984.

*Seymour Chase* argued the cause for appellants (*Chase & Chase,* attorneys; *Seymour Chase, Anthony N. Gallina* and *James P. Gagel,* on the briefs).

*Frank G. Alster* argued the cause for respondents.

The opinion of the Court was delivered by

SCHREIBER, J.

Edward Kawash and Theresa A. Kawash, who owned a home at 479 Weymouth Drive, Wyckoff, New Jersey, decided to add a patio to the rear of their house. They entered into a contract with the Mandara Masonry Corporation (Corporation)[1] for the construction of that patio at a cost of $5,000. The Corporation was owned by William S. Mandara, who constructed the addition with his father, Salvatore Mandara, and three other employees. According to the complaint, the patio was constructed in 1974.

---

[1]The complaint alleges the name of the defendant Corporation as William S. Mandara Masonry Corporation. This may be erroneous. If so, the complaint should be amended to designate the correct name. The defendants have never questioned the misnomer. The trial court mistakenly placed the burden of proof of the identity of the contractor on the defendant.

Plaintiffs, Richard F. Aronsohn and Deborah Aronsohn, purchased the home from Mr. and Mrs. Kawash in August 1975. The purchase agreement provided that the contract was subject to "a satisfactory engineering inspection," that the agreement was made "upon the knowledge of the parties as to the value of * * * whatever buildings are upon the [land] and not on any representations made as to character or quality," and that "no representations have been made by any of the parties * * * except as set forth herein."

In 1978, plaintiffs noticed that the patio was beginning to separate from the wall of the house; that some of the slate slabs that formed the patio floor were beginning to rise; and that the outside patio wall was beginning to buckle. Plaintiffs then commenced this action against the defendant Corporation and Salvatore Mandara alleging strict liability, negligence, and breaches of express and implied warranties.

At the trial plaintiffs introduced evidence establishing the aforementioned facts and also produced as their expert a building contractor who had made visual inspections of the patio. The patio floor consisted of slate slabs resting on concrete, which had been poured over a dirt foundation. The patio extended along the entire rear of the house, and since the land sloped sharply down away from the house, it had been necessary to build up the ground. The patio was surrounded by a cinder-block wall with brick facing.

The expert's ultimate conclusion was that the construction was improper, in part because the ground supporting the patio had not been adequately compacted. The expert asserted that because the dirt had been improperly compacted, it had pushed out the wall. He also testified that the penetration of water beneath the slabs had contributed to the problem. The water was unable to escape, according to him, because no weepholes had been provided to permit drainage. He estimated that it would cost $16,000 to remove the existing patio and install a new one.

Salvatore Mandara testified on behalf of defendants. He explained how the patio had been built and stated that the construction method accorded with industry standards. He also stated that the patio could have been built in another fashion, but that cost had been a factor for Mr. and Mrs. Kawash. In his opinion the problem was due to the owners' failure to patch up cracks as they appeared; had they done so, he said, water would not have seeped beneath the slabs into the ground, causing the slabs to rise and the wall to buckle.

The trial court granted defendants' motion to dismiss.[2] It found that plaintiffs' claim on express warranty was flawed because defendants' contract to construct the patio had been with Edward and Theresa Kawash and not the plaintiffs. It ruled that the negligence claim was also defective, reasoning that it was really a suit on the contract as well, since plaintiffs were seeking economic loss, rather than personal injury or property damage. The trial court also held that no implied warranty of habitability or strict liability applied because the philosophy of the law with respect to mass producers of goods or homes was inapplicable to a situation like this one, which involved a service contract.

The Appellate Division affirmed. It agreed that recovery for economic loss on a negligence theory was inappropriate. It also found that neither express nor implied warranty was justified since there was no privity of contract, though it disagreed with the trial court that this was a service contract. Lastly, the Appellate Division agreed that the concept of strict liability was inappropriate under these circumstances.

We granted plaintiffs' petition for certification. 95 *N.J.* 202 (1983).

---

[2]Defendants had other evidence. The trial judge, who had permitted defendants to produce only one witness before the noon recess, mistakenly believed that he could not reserve decision on the defendants' motion. The trial court therefore granted the motion immediately after the recess.

## I

Plaintiffs are seeking the benefit of the bargain they made in their agreement to purchase the home. That benefit is based on the previous owners' contract with defendants to construct the patio. This case does not involve sale and distribution of personal property; nor does it involve personal injury or property damage arising out of a traumatic event.

Analysis must start with the agreement defendants made with the Kawashes since that contract, presumably oral, would set forth the nature and scope of the contractor's duties. The repair agreement could describe, among other things, the grade and quality of materials to be used, the manner of installation, and the extent and nature of a warranty. The record does not disclose whether the Kawashes discussed these items with the contractor, although the contractor testified that his method of construction and choice of materials were influenced by the price of the job.

When, as in this case, there is no express contractual provision concerning workmanship, the law implies a covenant that the contract will be performed in a reasonably good and workmanlike manner. The agreement between defendant and the Kawashes concerning the building of the patio thus contained an implied promise by defendant to construct the patio in a workmanlike fashion. *See Minemount Realty Co. v. Ballentine,* 111 *N.J.Eq.* 398, 399 (E. & A. 1932) ("Where a party contracts to build a building for a specified purpose, the law reads into the contract a stipulation that the building shall be erected in a reasonably good and workmanlike manner and when completed shall be reasonably fit for the intended purpose."); *Schipper v. Levitt & Sons, Inc.,* 44 *N.J.* 70, 91 (1965) (home buyer relies on mass housing developer's "implied representation that the house will be erected in a reasonably workmanlike manner"). If the Kawashes, while they still owned the property, had discovered that the patio had been negligently built, defendants would have been liable to them for damage to the property flowing

from a breach of that implied promise of reasonable workmanship. The question in this case is whether the contractor should be immunized from his contractual obligation to have performed his work in a workmanlike, non-negligent manner simply because the original owner or buyer transferred the property to a successor. We think not, at least in the absence of a nonassignability clause in the contract.[3]

Ordinarily, rights for breach of contract are assignable. There would certainly be no problem with enforcing such an assignment if the contract between the contractor and the homeowner contained an express provision authorizing assignment to a successor owner of the homeowner's rights against the contractor. *See Restatement (Second) of the Law of Contracts* § 317 (1981). If the contract contains no prohibition on assignment, such rights may be assigned in the absence of any public policy reason to the contrary. *See* 4 *A. Corbin, On Contracts* § 857, at 410; § 872, at 485–86; § 873, at 494 (1951). Here, there has been no proof of any provision in the Kawashes' contract with defendant prohibiting assignment of the Kawashes' contractual rights, and there are no compelling policy reasons justifying a bar to the assignment of those rights.

---

[3]The New Home Warranty and Builders' Registration Act, *N.J.S.A.* 46:3B–1 to 46:3B–12, provides that builders of new homes must provide warranties of one, two, and ten years on various parts of the homes to the owners, meaning any person for whom the new home is built. *N.J.S.A.* 46:3B–2d, –2e, –3b. Interestingly, while the regulations delineating the subject matter of these warranties exclude "unattached" patios from required warranties, *N.J.A.C.* 5:25–3.3(d)2, they do require a one-year warranty on attached patios, *N.J.A.C.* 5:25–3.2(a)1i. The regulations note that "[c]racks in excess of ¼ inch width or in vertical displacement are considered excessive" in attached patios, *N.J.A.C.* 5:25–3.-4(c)1v(1), and the responsibility imposed upon the builder for such excessive cracks is "to repair as required," *N.J.A.C.* 5:25–3.4(c)1v(2). This and other warranties under the Act extend to the owner's "successors in title to the home." *N.J.S.A.* 46:3B–2e. However, the definition of "new home" in *N.J.S.A.* 46:3B–2d refers only to the initial occupants of a new home.

■■ Moreover, one can infer from the circumstances that the Kawashes did in fact assign those rights to plaintiffs. Once they sold their house to plaintiffs, the Kawashes no longer had any interest in retaining for themselves the right to have had their patio built in a non-negligent manner. Rather, it is reasonable to infer that they transferred any such claim to plaintiffs. The transfer or conveyance of their property is indicative of their intent to assign to the buyers their right of action to enforce promises made with respect to that property. *See* 3 *H. Tiffany, Real Property* § 849, at 444 (3d ed. 1939). Defendants' contention that the provision in the purchase agreement that "[t]his contract contains the entire agreement of the parties" impliedly negates any assignment of the contract between defendants and the Kawashes misses the point. The implied covenants and terms of a contract are as effective components of the agreement as those expressed.

Of course, the sales contract between the Kawashes and plaintiffs could conceivably have limited any claim by plaintiffs against the contractor. For example, if the purchase agreement referred expressly to certain limitations in the contractor's contract with the Kawashes concerning the extent and nature of the contractor's warranty, plaintiffs might equitably be bound by those restrictions. In addition, if the purchaser were aware of a defective condition after making a reasonable inspection of the home, he presumably would have fixed the price of the house with that condition in mind. Here, the contract provided that plaintiffs had the right to make "a satisfactory engineering inspection" and to cancel the contract if the report were unsatisfactory. Thus, if any defective condition were readily apparent or discoverable upon a reasonable inspection before or at the time plaintiffs took title (the precise time being dependent upon the terms of the purchase contract), then recovery for that defective condition might not be appropriate, on the theory that the purchaser would have taken this factor into account in the price. *Cosmopolitan Homes, Inc. v. Weller,* 663 *P.*2d 1041, 1045–46 (Colo.1983).

Defendants' implied promise to construct the patio in a workmanlike manner may also be analogized to a real property covenant that runs with the land. What happens when a vendor has had a new roof installed, accompanied by a ten-year warranty, and the vendor sells the home within one year after the installation? Should not covenants of this type, which benefit the property, continue to run with the land? Although the technical elements of covenants that run with the land may not be satisfied,[4] the policy reasons for not requiring contractual privity are fully applicable to promises by contractors properly to perform their work on residential homes. The benefits of such covenants touch and concern the property and should flow with the ownership despite the absence of privity between the contractor and the present owner. This policy was expressed in *Horn v. Miller*, 136 *Pa.* 640, 20 *A.* 706 (1890), as follows:

> The obligation of contracts is, in general, limited to the parties making them. Where privity of contract is dispensed with, there must ordinarily be privity of estate; but justice sometimes even requires that the right to enjoy such contracts should extend to all who have a beneficial interest in their fulfillment, not to impose a burden upon an ignorant and innocent third person, but to enable purchasers of land to avail themselves of the benefit to which they are in justice entitled. [*Id.* at 654, 20 *A.* at 708.]

*See also Weintraub v. Krobatsch*, 64 *N.J.* 445 (1974) (discussing sellers' implied warranties to buyers of homes), in which Justice Jacobs commented:

> Our courts have come a long way since the days when the judicial emphasis was on formal rules and ancient precedents rather than on modern concepts of justice and fair dealing. While admittedly our law has progressed more slowly in the real property field than in other fields, there have been notable stirrings even there. [*Id.* at 456.]

---

[4]Tiffany, in his treatise on property, has described the requirements for covenants running with the land as follows:

> Generally, to create a covenant running with the land, there must be a writing which satisfies the statute of frauds; the parties must intend that the covenant run with the land; the covenant must touch and concern the land; and privity of estate must exist between the original and the grantee at the time the covenant is made. [*H. Tiffany, Real Property* § 848, at 264–65 (3d ed. Supp.1984) (footnote omitted).]

There is some precedent for extending the contractual liability of a home builder to a third person who may buy that home despite the absence of contractual privity between the contractor and the buyer. In *Keyes v. Guy Bailey Homes, Inc.*, 439 *So.*2d 670 (Miss.1983), a subsequent purchaser of a home sued the builder-vendor for breach of an implied warranty of good workmanship resulting in a cracked foundation. The court noted that if a home has latent defects as a result of poor construction, the purchaser may be subjected to financial losses against which he had no practical means of protecting himself, and opined that an innocent purchaser should not suffer when the builder failed to construct the house in a workmanlike manner. The court quoted approvingly the following language from *Moxley v. Laramie*, 600 *P.*2d 733, 736 (Wyo.1979):

> Let us assume for example a person contracts construction of a home and, a month after occupying, is transferred to another locality and must sell. Or let us look at the family which contracts construction, occupies the home and the head of the household dies a year later and the residence must, for economic reasons, be sold. Further, how about the one who contracts for construction of a home, occupies it and, after a couple of years, attracted by a profit incentive caused by inflation or otherwise, sells to another. No reason has been presented to us whereby the original owner should have the benefits of an implied warranty or a recovery on a negligence theory and the next owner should not simply because there has been a transfer. Such intervening sales, standing by themselves, should not, by any standard of reasonableness, effect an end to an implied warranty or, in that matter, a right of recovery on any other ground, upon manifestation of a defect. The builder always has available the defense that the defects are not attributable to him. [439 *So.*2d at 672.]

We agree with the Mississippi Supreme Court that the privity requirement should be abandoned in suits brought by a homeowner against a contractor for violation of an implied promise of good workmanship. To require privity between the contractor and the homeowner in such a situation would defeat the purpose of the implied warranty of good workmanship and could leave innocent homeowners without a remedy for negligently built structures in their home. The contractor should not be relieved of liability for unworkmanlike construction simply because of the fortuity that the property on which he did the construction has changed hands. Nor should an innocent

buyer of property be deprived of recourse against a contractor who made improvements on the property if the buyer suffers financial loss as a result of the contractor's negligent workmanship. This is not to say that a contractor, in his agreement with the owner, could not have imposed limitations or restrictions on his obligations that could be binding on a subsequent purchaser, provided they did not contravene public policy. Such a distribution of risks comports with the original negotiation. *See* Epstein, "Commentary on Product Liability—Passage of Time," 58 *N.Y.U. L.Rev.* 930, 933 (1983).

## II

■ Although we find that defendants may be liable to plaintiffs for violating an implied provision of their contract with the Kawashes, we agree with the trial court and the Appellate Division that plaintiffs may not sustain a cause of action against defendants on any express provision in that contract. Plaintiffs did not establish that defendants had violated any express provisions in the Kawashes' agreement.[5]

■ We also hold that plaintiffs may not maintain a suit against defendants on a theory of implied warranty of habitability. Plaintiffs urge that such an implied warranty, as established in *McDonald v. Mianecki,* 79 *N.J.* 275 (1979), should be extended to include a suit for damages brought by a subsequent purchaser of a home against an independent contractor.[6] However, plaintiffs have misperceived the basic nature and scope of the implied warranty of habitability.

---

[5]The record indicates that the contractor and the Kawashes entered into an oral agreement and that a sketch of the patio had been prepared in advance. However, the sketch was not produced at trial, and the terms of the oral agreement, including the specifications, were not described.

[6]Neither party considered the effect, if any, of The New Home Warranty and Builders' Registration Act, *N.J.S.A.* 46:3B–1 to –12, on the *McDonald* implied warranty of habitability. The Act contains two plans to protect the initial owner-occupier of new homes with respect to various types of defects. Under one plan a new home warranty security fund is maintained by the State

In *McDonald*, the plaintiff entered into a contract with the defendant, who had offered to construct a home on defendant's land. The contract provided that the defendant would also dig a well that would service the house with water. The water proved to be discolored and nonpotable. We held that builder-vendors "impliedly warrant that a house which they construct will be of reasonable workmanship and habitability," 79 *N.J.* at 293, and that the implied warranty of habitability included potable water, *id.* at 298. We noted that the sale of personal property generally carried with it an implied warranty of merchantability and often an implied warranty of fitness for a particular purpose, citing *N.J.S.A.* 12A:2–314 and –315; that the doctrine of *caveat emptor* was outmoded; and that sales of real property should be placed on a footing equal with those of personal property. *Id.* at 283–85, 299.

The contract in this case, however, does not involve a defect affecting the essential habitability of the home.[7] Habitability is synonymous with suitability for living purposes; the home must be occupiable. *See Trentacost v. Brussel*, 82 *N.J.* 214, 225 (1980) ("At a minimum, the necessities of a habitable residence include sufficient heat and ventilation, adequate light, plumbing and sanitation and proper security and maintenance.");

---

Treasurer and administered by the Commissioner of the Department of Community Affairs. *N.J.S.A.* 46:3B–7. An alternative plan is a new home warranty insurance program approved by the Commissioner of Insurance. *N.J.S.A.* 46:3B–8. The owner-occupier of a new home may elect to pursue rights and remedies other than the warranties under the Act. *N.J.S.A.* 46:3B–9.

[7] *See Hermes v. Staiano*, 181 *N.J.Super.* 424 (Law Div.1981), holding that when a new home was built in 1969 for purchaser who sold to plaintiff in 1973 and plaintiff encountered difficulty from 1976 on with septic tank and cellar wall, the doctrines of implied warranty of habitability and strict liability applied to plaintiff. 181 *N.J.Super.* at 432–33. We neither approve nor disapprove of the application of these principles to the circumstances of that case.

*Marini v. Ireland,* 56 *N.J.* 130, 146 (1970) (habitability covers
"vital facilities necessary to maintain premises in a livable condi-
tion"); *Chess v. Muhammad,* 179 *N.J.Super.* 75, 77 (App.
Div.1981) (referring to habitability in terms of "facilities vital to
the use of the premises"); *Campbell v. Randville Const. Corp.,*
172 *N.J.Super.* 93, 96–97 (App.Div.), certif. denied, 84 *N.J.* 405
(1980) (implied warranty did not include health of trees on prop-
erty of new home). The record here is devoid of any evidence
that the patio, only parts of which were damaged, constituted a
vital living element in the home. Apparently, the home had been
lived in for many years without a patio. The doctrine of implied
warranty of habitability is therefore inapplicable under the cir-
cumstances here. That does not mean, of course, that in other
situations a breach of an implied warranty of reasonable work-
manship could not also constitute a breach of an implied warran-
ty of habitability, if the condition were sufficiently serious to
affect the home's habitability.

### III

With respect to plaintiffs' negligence claim, the central ques-
tion is whether a person who purchases a house, including a
patio, from a prior owner may have a valid negligence action
against the builder of the patio for loss of the benefit of his
bargain damages due to the defective condition of the patio.

Under well-established principles a contractor has a
duty to persons, other than the one with whom the contractor
has made the contract, to carry out his undertaken work in a
careful and prudent manner, and he may be responsible to third
persons for their personal injuries and property damages proxi-
mately caused by his failure to exercise that care. This duty
exists irrespective of privity. *Bacak v. Hogya,* 4 *N.J.* 417,
422–23 (1950); *Barbero v. Pellegrino,* 108 *N.J.L.* 156, 158–59 (E.

& A. 1931); *Sarno v. Gulf Ref. Co.*, 99 *N.J.L.* 340, 344 (Sup.Ct.1924), aff'd *per curiam*, 102 *N.J.L.* 223 (E. & A. 1925).

It is the contractor's undertaking that gives rise to his duty. Dean Prosser has explained the theory in the following manner:

> In other words, the absence of "privity" between the parties makes it difficult to found any duty to the plaintiff upon the contract itself. But by entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person. [*W. Prosser, Handbook of the Law of Torts* § 93 (4th ed. 1971) (footnotes omitted).]

This principle has been applied to make contractors liable in tort to all those who may be injured by a negligently-built structure. *Schipper v. Levitt & Sons, Inc.*, 44 *N.J.* 70 (1965).

*Schipper v. Levitt & Sons, Inc., supra,* 44 *N.J.* 70, extended the tort liability of a home developer to the family of a lessee of a home that the developer had sold to the lessee's landlord. Justice Jacobs, writing for the Court in *Schipper,* held in a comprehensive opinion that liability could be sustained under a theory of negligence in the absence of privity between the parties. In support, he relied on numerous decisions in other jurisdictions that had applied ordinary negligence principles to permit recovery by third persons, including successor owners, against building contractors. For cases decided subsequent to *Schipper* to the same effect, see *Coburn v. Lenox Homes, Inc.*, 173 *Conn.* 567, 573–77, 378 *A.*2d 599, 602–03 (1977); *McDonough v. Whalen,* 365 *Mass.* 506, 510–14, 313 *N.E.*2d 435, 438–40 (1974); *Newman v. Tualatin Development Co.*, 287 *Or.* 47, 50–54, 597 *P.*2d 800, 802–03 (1979); *Terlinde v. Neely,* 275 *S.C.* 395, 399, 271 *S.E.*2d 768, 770 (1980); *Moxley v. Laramie Builders, Inc.*, 600 *P.*2d 733, 736 (Wyo.1979).

Until *Schipper, supra,* 44 *N.J.* 70 and *Totten v. Gruzen,* 52 *N.J.* 202 (1968), the contractor's duty to third persons terminated when his work was finished and accepted by the party who engaged him. *See Miller v. Davis & Averill, Inc.,* 137 *N.J.L.* 671,

673–75 (E. & A. 1948). *Totten* applied negligence principles to individual builders in addition to the *Schipper* mass developers and rejected the completed-and-accepted principle, holding that the contractor's duty continued after the work was done. 52 *N.J.* at 210. Now, therefore, a contractor may be liable to third persons who suffer personal injury and property damages as a proximate result of a contractor's negligent workmanship after he has completed the job.

However, what is involved here is essentially a commercial transaction, and plaintiffs' claim is rested on the violation of the implied contractual provision that the patio would be constructed in a workmanlike fashion. We do not intend to exclude the possibility that a cause of action in negligence would be maintainable. *See Rosenau v. City of New Brunswick,* 51 *N.J.* 130 (1968) (holding valid a negligence suit in which a consumer of water supplied by the city sued the manufacturer of a defective meter which allegedly caused water damage to the meter as well as to his home). However, we do not need to decide the validity of plaintiffs' negligence claim, since, as discussed above, the contractor's negligence would constitute a breach of the contractor's implied promise to construct the patio in a workmanlike manner.

## IV

There was conflicting evidence in the instant case as to whether the defendant Corporation built the patio in a workmanlike manner. Since the evidence should have been judged in the light most favorable to the plaintiffs on the defendant's motion for judgment, *Dolson v. Anastasia,* 55 *N.J.* 2, 5–6 (1969), we are of the opinion, for the reasons stated, that plaintiffs made a prima facie showing of a cause of action. Therefore, the matter should be remanded for a new trial.

On retrial several other matters will undoubtedly be clarified. Plaintiffs' purchase contract provided that they could have an engineering inspection of the premises. The record does not

disclose the nature and extent of that inspection. A building contractor who had examined the patio for the plaintiffs at the time of their purchase, but did not testify, made no comment to them with respect to the condition or construction of the patio. Presumably the examination was satisfactory. If, as previously stated, a defective condition had been readily apparent or discoverable upon a reasonable inspection before or at the time plaintiffs took title, then recovery for the defective condition would not be appropriate. For example, plaintiffs' complaint about the lack of weepholes, a condition that was readily apparent on visual inspection, is not well founded.

The record is not clear whether the other allegedly defective condition, inadequate compaction of the ground, was apparent or discoverable upon a reasonable inspection. It is also uncertain whether plaintiffs might have prevented the damage if they had acted promptly when cracks first appeared. In addition, there was some evidence of the cost of a new patio, but that evidence did not take into account depreciation. These and other matters to which we have referred should be explored on the retrial.

The case is reversed and remanded for a new trial, with costs to abide the event.

*For reversal and remandment*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALID,—7.