**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4058-18

ENCLAVE CONDOMINIUM
ASSOCIATION,

     Plaintiff-Appellant,

v.

LIME CONTRACTING, INC.,
and KEMPER INSURANCE
COMPANY, a Corporation,
as successor in interest to Universal
Bonding Insurance Company,

     Defendants-Respondents,

and

KANALSTEIN DANTON
ASSOCIATES, P.A., O'DONNELL
& NACCARATO, INC., and
STRONGWALL INDUSTRIES,
INC.,

     Defendants,

and

LIME CONTRACTING, INC.,

Defendant-Respondent/
Third Party Plaintiff,

v.

STRONGWALL INDUSTRIES,
INC., DURAN PAINT k/n/a
SHERWIN WILLIAMS, SIKA
CORP., TRACO WINDOWS, and
O'DONNELL & NACCARATO,

    Third-Party Defendants.

and

KANALSTEIN DANTON
ASSOCIATES, P.A.,

    Defendant/ Third-Party
    Plaintiff,

v.

O'DONNELL & NACCARATO,

    Third-Party Defendant.
_____

Argued May 19, 2021 – Decided July 23, 2021

Before Judges Sumners and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-4523-10.

R.C. Westmoreland argued the cause for appellant (Westmoreland Vesper Quattrone & Beers, PA, attorneys; R.C. Westmoreland, on the briefs).

A-4058-18

Kevin J. Russell argued the cause for respondent, Lumbermens Casualty Insurance Company.[1]

David P. Lonski argued the cause for respondent, Lime Contracting, Inc. (Shamy, Shipers & Lonski, PC, attorneys; David P. Lonski, on the brief).

Sharon K. Galpern argued the cause for respondent, Lime Contracting, Inc. as to Count 6 of the Amended Complaint (Stahl & DeLaurentis, PC, attorneys, join in the brief of respondent Lumbermens Casualty Insurance Company).

PER CURIAM

Plaintiff Enclave Condominium Association (Enclave) appeals from a June 30, 2017 order that: (1) barred the testimony of Enclave's liability expert, Andrew G. Scheerer, P.E.; (2) granted summary judgment to defendants Lime Contracting, Inc. (Lime) and Lumbermens Casualty Insurance Company (Lumbermens); and (3) dismissed plaintiff's second amended complaint with prejudice. We affirm substantially for the reasons expressed by Judge James P. Savio in his comprehensive written decision.

This case stems from a project to restore the exterior of a high-rise condominium building that was experiencing water infiltration. Several parties were involved in the project. This appeal is limited to issues involving Lime,

---

[1] Improperly pled as Kemper Insurance Company.

the contractor for the project, and Lumbermens, the bond surety. Enclave alleged Lime breached the contract and was negligent. Enclave raises three principal issues, claiming the trial court erred by: (1) barring Scheerer's report and expert testimony as inadmissible net opinions; (2) concluding backer rods and backer board tape were not required by the plans and specifications; and (3) not conducting a N.J.R.E. 104 hearing.

We derive the following facts from the record. Enclave retained Kanalstein Danton Associates, P.A. (KDA), a licensed architectural firm, and O'Donnell & Naccarator, Inc. (O&N), a licensed engineering firm, to investigate water leakage conditions at its high-rise condominium building located along the Atlantic City boardwalk. Following two years of investigation by KDA and O&N, a construction contract for the restoration of the exterior of the building was prepared by KDA, O&N, and Enclave's attorney. In February 2002, Enclave contracted with Lime to perform the exterior restoration work. The Agreement between the parties, which was frequently revised as the work progressed, ultimately consisted of several hundred pages of documents, drawings, meeting notes, and revisions. Lime's scope of work and the specifications for the project constantly changed as the work progressed.

A-4058-18

On August 18, 2010, Enclave filed a complaint alleging breach of contract, negligence, and consumer fraud claims against Lime, Lumbermens, and KDA, the project architect. In an amended complaint, Enclave named O&N and Strongwall Industries, Inc. (Strongwall) as additional direct defendants.[2] In April 2015, Enclave filed a second amended complaint that named Lime, KDA, O&N, Strongwall, and Lumbermens as defendants.[3] Pertinent to this appeal, count five alleged Lime breached its contractual duties by "failing to comply with the plans and specifications set forth in the Agreement or otherwise failing to do the job in a workmanlike manner . . . ."

More specifically, Enclave alleged that Lime: (1) "removed outer facade, cleaned and prepared the surface for installation of a new outer facade in a defective and unworkmanlike manner"; (2) "caulked the windows in a defective and unworkmanlike manner contrary to the specifications and industry standards"; (3) "failed to properly and in [a] . . . workmanlike manner apply the coating to the balconies and . . . properly caulk the transition from the coating to the glass doors"; (4) "failed to supervise . . . its workmen, permitting defective work to be performed by them on the facade, the balconies, and the garage

_____

[2] Enclave's first amended complaint is not part of the record on appeal.

[3] Enclave settled and dismissed its claims against O&N, KDA, and Strongwall.

floors"; (5) "failed to correct the building's leaks as required by their contract"; (6) "on the advice of [Lime, KDA, and O&N], [Enclave] replaced the windows on the ocean side of the building, which did not stop the leaking because it was later discovered that the leaks were being caused by the negligently-installed facade, making clear that the window replacement was an unnecessary act and cost"; and (7) convinced Enclave, KDA, and O&N "to change the original specifications" by allowing it to use an inadequate acrylic coating on the balconies, then and applied the acrylic coating "in a defective manner . . . ."

Enclave allegedly notified Lime of these issues in April 2008, but Lime "refuse[d] to remedy the situation by making reparations to the building without further cost to [Enclave]." Enclave claimed that "[r]estorations to bring the building into compliance with the plans [would] be costly, damaging [Enclave] in the amount of $2.3 million."

In count six, Enclave claimed Lime was liable for negligently performing its contractual duties. Enclave alleged that Lime breached its duty of care by: (1) "failing to exercise reasonable and ordinary care in building, constructing, and developing [Enclave's] property in a good and workmanlike manner and of sufficient quality"; (2) "failing to adequately and properly retain, superintend and supervise all employees and subcontractors on the work of improvement";

and (3) "failing to refrain from actions which would damage the property in areas inside and outside the intended scope of work." Enclave claimed that Lime's negligence caused damage to the exterior and interior of the property, which required Enclave to hire other contractors to perform repairs.

Count seven alleged Lumbermens issued a $2,126,000 contract bond to indemnify Enclave and "hold it harmless from any pecuniary loss resulting from a breach of any of the terms, conditions[,] or covenants of the construction contract by its principal, [Lime]." To secure "performance of the contract and the completion of the improvements, [Lime and Lumbermens] executed and delivered to [Enclave] . . . their bond in the sum of $1,653,479." Lumbermens agreed "to complete the contact or fund the completion" in the event Lime breached the contract. On July 28, 2008, Enclave gave Lumbermens "[n]otice to perform under the [b]ond" and alleged Lumbermens "failed to honor its obligations" under the bond.

Enclave retained Scheerer as a liability and damage expert and Mark Harris Berman, AIA, PP (Berman), a principal of Berman & Wright Architecture, Engineering & Planning, LLC, as a damage expert. Scheerer issued four reports and was deposed over the course of six days. Discovery ended on July 1, 2016.

A-4058-18

In April 2016, Lime moved to bar Scheerer's and Berman's expert reports and testimony as inadmissible net opinions and for summary judgment. In May 2016, Lumbermens moved for summary judgment and joined in Lime's motion to bar the testimony of Enclave's experts.

Following oral argument, Judge Savio was informed that Scheerer was Enclave's sole liability expert on its breach of contract claim against Lime. Enclave confirmed that Berman would testify against Lime only as to damages.

During a telephonic conference in November 2016, counsel for Enclave, Lime, and Lumbermens advised Judge Savio that they agreed that a N.J.R.E 104(a) hearing was not necessary. Counsel further agreed that the court could decide the motions to bar Scheerer's testimony without oral argument, based on Scheerer's deposition testimony and the briefs submitted.

On June 30, 2017, Judge Savio issued an order and accompanying sixty-two-page memorandum of decision barring Scheerer's expert testimony, granting summary judgment to Lime and Lumbermens, and dismissing Enclave's second amended complaint with prejudice.

Before addressing the arguments, the judge considered the deposition testimony and summarized the relevant documents. First, he looked to Scheerer's April 10, 2012 report titled "Restoration & Cost Report For Façade

8

& Balconies." Second, the judge considered the certification of Paul Perrina, the president of Lime. Third, he considered the deposition testimony of O&N's project manager, Steven L. Eliker. Last, the judge considered Scheerer's deposition testimony.

The judge noted that Scheerer conducted multiple site visits from 2007 to 2012 to observe and prepare building restoration documents to address the façade and balcony leaks. Scheerer's report noted Structural Design Associates (SDA) performed multiple "swing stage inspections and prepared façade and balconies repair documents during the period of 2007 to 2012." The opinions expressed in Scheerer's April 10, 2012 report were based upon information provided by SDA and visually accessible conditions observed during SDA's investigations. The report stated that "during the window water testing, SDA discovered that the Duran waterproofing façade coating [applied] by Lime was delaminating from the concrete substrate." The report contained the following list of building deficiencies and damages observed by SDA.

1. Adhesive or cohesive failure of sealant[.]
2. Sealants improperly applied over sealant and/or waterproofing coatings.
3. Sealants improperly applied without backer rod or bond breaker tape.
4. Unsealed joint or gaps in sealant application.
5. Dissimilar materials in contact without required sealant joint.

A-4058-18

6. Insufficient slope of balcony topping or drainage impeded.
7. Insufficient bond [of] topping material to underlying concrete substrate.
8. Insufficient bond [of] concrete rail patch, grout, or repair material to underlying concrete.
9. Cracks in exterior façade and balcony not sealed.
10. Unfilled surface air voids in concrete façade (surface imperfections).
11. Waterproof coating not applied properly.
12. Conditions allowing water infiltration below repair materials and into interiors.

In addition, the section of the report titled "Documentation of Existing Conditions," included Scheerer's opinions based upon the visually accessible conditions observed during SDA's investigations. The court highlighted the following sections from the report:

Concrete Façade and Rehabilitation

The existing Duran elastomeric coating installed by Lime was the proper product selection to coat the faced walls. The present failure of the facade coating was due to poor preparation of the concrete substrate and a lack of cohesive bond. Lime did not properly replace the building concrete sealant joints.

. . . .

Balcony Railing Post Anchorage

The past requirement to remove balcony railings by Lime has caused railing post pocket failures. Water is actively entering the rails and post pockets . . . .

10

The rail pocket failures are due to poor patching requirements by Lime and poor handrail specifications to patch and seal by the design professionals.

Balcony Waterproof Coating

The Strongwall balcony coating is an acrylic waterproofing coating that was improperly specified for the post tension concrete building structure. The Strongwall coating does not have the flexibility to bridge balcony slab cracks that are typical of post tension structures . . . The Strongwall balcony coating was the incorrect product to coat the Enclave balconies.

Next, the court discussed Perrina's certification, which revealed "Lime first performed work for Enclave in 2000 when it, and other contractors, were hired to apply balcony coating materials to test balconies. Enclave was not satisfied with the products selected by" KDA and O&N. "Enclave requested that the applicators advise of other products that they had used which did not have any odor and had a smooth finish. Perrina provided the name of two (2) or more products to Enclave and its professionals." Unbeknownst to Perrina, Enclave completed the bid packages and awarded the contract to another contractor. However, during the Fall of 2001, Enclave contacted Perrina for Lime to submit a bid because the contractor had left the job. Enclave informed Perrina that the previous "contractor was not careful and ruptured a structural

cable running within the balcony floor." Perrina was warned to not penetrate the existing balcony floors for any reason.

Lime bid on the work and a contract was prepared, which listed KDA and O&N as Enclave's "representatives for purposes of the administration of the contract." "The bid consisted of a series of unit prices for concrete repair work, such as per linear foot for crack repairs and per square foot for spall repairs."

"According to Perrina, the work to be performed by Lime constantly changed." Although the contract was dated February 1, 2002, the Agreement consisted "of the following documents: the February 1, 2002 Agreement; the General Conditions of the Contract; the Project Manual as amended; Addenda 'A' through 'E'; Construction Bulletins #1 through #5; eighteen (18) Architectural Sheets; Numerous Field drawings by O&N; Specifications; Change Orders; and Bi-Weekly Meetings memorialized in Written Minutes." "Perrina certifie[d] that many of these documents were prepared after the original contracts were executed in 2002."

"Perrina certifie[d] that . . . the pitch of the balconies varied greatly from balcony-to-balcony and from the architectural drawings[,]" and "very few balconies had enough pitch to create a slope as set forth in the drawings." "Enclave and its professionals were alerted to this fact." As a result, the "scope

12

A-4058-18

of the work on the balconies varied from balcony-to-balcony and the work to be performed was directed by the Enclave's representatives, KDA and O&N in the field." Notably, Eliker's statements about "the revisions made to the original specifications accurately reflect[ed] the revisions to the contract related to Lime's scope of work."

The judge found that Perrina's certification demonstrated that the work progressed in the following manner. First, "Lime would scarify and sound the concrete to remove loose debris"; second, "Enclave's representatives would view the building and identify those areas for which Lime would be paid to make repairs to the concrete"; third, "Lime would make the requested repairs to the concrete"; fourth, "Enclave's representatives would view Lime's work to satisfy themselves that the repairs were in accordance with the specifications and to measure the quantity of repairs for billing purposes"; and last, "Lime would apply the top coating materials and Enclave's representative would again view the work to confirm that the work was performed in accordance with the specifications." Lime performed the work in phases over the course of several years.

After Lime completed the west elevation of the building in 2002, Enclave received complaints that water continued to penetrate the condominium units.

13

Lime was advised that Enclave hired a contractor named Quinn "to inject foam into the base of the window walls and sliding glass doors. The project was [a] complete failure." "[T]he project created holes in the window frames, which allowed water to enter into the units." "Perrina certifie[d] that Lime was instructed not to address these holes or the window wall threshold issues."

> By 2006, Lime had completed its work. Enclave and its professional representatives developed a punch list. Lime protested that much of the requested punch list was a matter of maintenance, since new cracks had developed after Lime completed its work in accordance with the contract documents, as revised. Enclave agreed and Addendum "E" was executed in early 2007, in which Lime would be paid extra to complete all of the items on the punch list. Each item on the punch list was inspected by . . . Enclave's design professional and certified as completed in accordance with the contract. Lime received its final payment in . . . 2007.

The judge next considered Eliker's deposition testimony. Eliker, O&N's project manager, confirmed "that O&N was originally responsible for the walls and then ultimately became responsible for the balconies." Eliker testified that KDA "prepared drawings for the balconies" that "were not possible to achieve" and "just couldn't work." Eliker explained that "after talking to KDA, . . . Enclave directed O&N to do the best that it could on the balconies because KDA's recommended alternative repairs were expensive . . . ." "[D]ue to the balcony pitch limitations encountered in the field, O&N advised . . . Enclave

14

that there [was] no solution without replacing window walls and that it [was] too expensive to replace all of the windows and doors."

According to Eliker, "[t]he foam injection work by Quinn was an experiment intended to prevent water from entering the Enclave building through the wall thresholds . . . that did not work . . . ." As for the crack repairs, Eliker explained it was mostly the manufacturer of the materials that specified which cracks to repair at each balcony. When asked about the specifications for the work on the balconies, Eliker believed that the project specifications required the use of a Tamms product or some equivalent. When asked if he knew whether the specifications allowed for the substitution of materials, Eliker replied that similar materials were usually allowed. However, the specifications required O&N to approve the substitution of materials.

In addition, Eliker explained that the work using Strongwall materials was done in accordance with Strongwall specifications. In February 2002, Eliker wrote to Perrina informing him that "Eliker reviewed Lime's coating and patching material submittals and had no objections." The letter included an attachment from Strongwall with detailed instructions for applying the product. "Regarding the cracks, where cables met the end of the balconies, Eliker confirmed that 'we seal those cracks the best we can.'" Eliker admitted that

15

water infiltration persisted because the cracks still moved. He testified that even if everything was done according to the specifications, it is possible that if there was movement, there would still be water infiltration.

Eliker confirmed that there were many changes to the scope of Lime's work compared to those originally set forth in the project manual. "[O]nce Lime came into the picture, the manual was thrown out. Everything was different." Eliker explained that the purpose of the project manual is to detail all the specifications, including "how the contractor gets paid and submission for payment, what he has to submit for approvals[,]" and "technical specification[s]" identifying the required materials and their application. The contractor relies on the specifications and details in the project manual to perform its work. However, since the project manual was "thrown out" and different products were being used, the parties employed "a process by which you would submit requests for payment and change orders . . . ." Eliker's testimony and the construction meeting minutes suggested that Lime's scope of the work was amended.

Next, the judge reviewed Scheerer's deposition testimony. Scheerer explained that the sealant contained no backer rod. However, when asked whether the specification required the use of a backer rod, Scheerer explained it was standard practice in the industry for caulking control joints. When asked if

they reviewed the product specifications to determine if it required use of a backer rod, Scheerer answered, "No." Scheerer also "testified that although he knew the name of Quinn Contracting, it did not mean anything to him with relation to the Enclave project."

Scheerer testified that there was no coating on the weep holes. "When asked if he knew if there was supposed to be coating in those weep holes, Scheerer replied he wasn't around during construction." Scheerer "reviewed some of O&N's plans, but when asked" whether the plans required use of Elastomeric or Strongwall coating in the weep holes, Scheerer explained that the drawings were not detailed or clear.

Scheerer's testimony revealed that he "did not know the manufacturer of the original curtain wall sliding doors." When asked how he determined the life expectancy of those doors, Scheerer testified that published standards generally provided information about the life expectancy of products. Although Scheerer explained that the American Architectural Manufacturing Association (AMMA) published standards concerning aluminum products and curtain walls, windows, and doors, Scheerer did not consult such standards when he informed the Enclave's Board about the lifespan of the curtain wall doors. Instead, based on his fifteen years of experience with designing window systems and curtain walls,

A-4058-18

he was confident that he could "give them a number that [he] felt good about." In addition, when asked if he knew the life expectancy of the Strongwall products used on the balcony doors, Scheerer testified that "cementitious coatings, and that's what I will classify that product," would have a life expectancy of ten to twelve years in the environment of Atlantic City.

Scheerer's testimony further revealed he did not conduct any tests to determine why the Strongwall materials failed to bond to the underlying concrete substrate. Scheerer did not know whether the Strongwall's instructions required cracks to be treated before installation of the cementitious material.

Notably, Scheerer testified that he was not familiar with Lime's contract and did not thoroughly review it. He admitted "he did not see the contract that referenced the construction documents." Scheerer focused on the construction documents from KDA and O&N.

When asked if he knew whether Lime made any repairs to the roof, Scheerer said the "penthouse structure was coated and caulked." Further testimony from Scheerer revealed that he did not know whether Lime made repairs to the penthouse roof. Additionally, "Scheerer was unaware of any drawing or change order for the penthouse [and] unaware that Enclave management asked Lime for boxes of caulk."

When asked about the various damages he observed during inspections and his conclusions about what caused the damages, Scheerer admitted he conducted no tests and instead used his engineering judgment and experience to identify active leaks or signs of past leaks caused by the façade or the balconies. Scheerer later "admitted that he did not look at the Strongwall documents prior to issuing the reports."

Judge Savio concluded that the primary issue was whether Scheerer's deposition testimony and reports regarding the breach of contract claim were inadmissible net opinions. The judge rejected Enclave's contention that Aronsohn v. Mandara, 98 N.J. 92, 98 (1984), stood for the proposition that "a qualified expert, by observing the work, can opine to its failure to meet industry standards which, if proven, constitutes a breach of the construction contract." He found that the facts in Aronsohn were distinguishable. In Aronsohn "there was no evidence regarding the contract, the exact scope of work or the manner of installation; whereas in this present case, there was a written contract." In addition, unlike here, there was no architect or engineer involved in Aronsohn.

The judge concluded Scheerer had "a general lack of knowledge of Lime's contractual scope of work." He found "Scheerer had no knowledge of the

contract and was unaware of many aspects as to [what] Lime's scope of work and responsibilities were . . . ."

The judge found the "scope of work" consisted of various contract documents defining the specific work Enclave contracted Lime to perform. Article 1.1.3 of the Agreement referenced "contract documents" when defining the "work" to be performed by Lime. In addition, "contract documents" are defined in Article 1 as including "drawings, specifications and addenda and other documents."

Lime's "performance must be measured against the contract." Therefore, he "must compare the requirements of the contract against the actual performance to determine if there was a breach[,]" which required "a thorough review of the Enclave project record."

For Enclave to meet its burden of proof, it must (1) "clearly define the scope of Lime's contractual obligations"; (2) "identify, through competent testimony, how Lime specifically failed to fulfill its contractual obligations"; and (3) establish that Lime's breach caused loss to Enclave. Judge Savio concluded that Scheerer's testimony and reports failed to raise a jury question with respect to breach of contract because his deposition testimony clearly indicated he had not reviewed, nor familiarized himself with the contract

20

documents and did not know many aspects of Lime's original scope of work, or subsequent changes to the scope of work. He further found that Scheerer's conclusions about Lime's negligent work made no reference to any specifications of the work to be performed. In many instances,

> the alleged defect was an apparent omission by Lime in the performance of work (as adding a backer rod, filling bug holes, painting a primer coat) which were specifically addressed and eliminated from Lime's scope of work as demonstrated in the above-referenced certified statements and testimony.

Regarding the lack of a backer rod, the judge noted:

> Scheerer opines that the sealants were improperly applied without backer rod or bond breaker tape. However, during Scheerer's deposition testimony, when asked "where in this specification did it call for a backer rod[,"] he responded that "it's standard practice in my industry for caulking control joints." Immediately thereafter, when asked "did you review the product specifications to see if backer rod was specified by the professionals there," Scheerer answered "No."

The judge concluded that Scheerer was unable to provide testimony to show how Lime breached the terms of the contract regarding the backer rod issue because he knew nothing about Lime's scope of work and responsibilities as to the backer rod. He found that "aside from Scheerer's personal opinion, he [did] not offer any factual basis to support this opinion."

21

As to the issue of using Strongwall materials on the balconies, the judge found that Scheerer offered nothing more than: (1) "his personal and speculative opinion that he would not have specified Strongwall as a balcony coating"; (2) "visual inspections with no recorded or reproducible facts, measurements or other data"; and (3) "a res ipsa argument that because he has observed material delamination, damages must have occurred." He further found that Scheerer failed to provide any authority in support of his conclusion that the Strongwall material was inappropriate for a post tension building. Scheerer did not review Strongwall documents prior to issuing his report. "Additionally, [Scheerer] did not identify the actual Strongwall materials used at the project in his reports." Although Lime changed the balcony coating from the Tamms product originally specified to the Strongwall product, Scheerer testified that "the ultimate approval of changes in material lie with the design professionals."

As to Enclave's remaining allegation in count five, the judge found that Scheerer supplied "his observations and opinions" without identifying any contractual obligation linking Lime's performance with the alleged defective work. Judge Savio concluded that "Scheerer's opinion [was] purely speculative" since he "does not have a factual basis for his opinions."

In sum, Judge Savio determined that Schererer's testimony and reports constituted inadmissible net opinions and barred their use at trial.

As to count six, the judge found that Enclave's negligence claims against Lime were precluded by the economic loss doctrine. He explained that this "complex litigation" case involved breach of contract and negligence claims by Enclave against Lime for failing to complete the work in a workmanlike manner. The judge found that Article 3.5 of the contract contained an express contractual provision concerning workmanship. "Since there appears to be express contractual provisions regarding Lime's workmanship, the issue of whether or not there is an implied covenant that Lime will perform the contract in a reasonable, good and workmanlike manner is immaterial and secondary."

As to Enclave's remaining claims of negligence, such as negligent supervision of employees and subcontractors, the court found that those "allegations by Enclave against Lime sound in contract, not tort." Accordingly, he dismissed Enclave's negligence claims against Lime.

Judge Savio next addressed whether expert testimony was necessary to establish Enclave's breach of contract claim against Lime. Applying Butler v. Acme Markets, Inc., 89 N.J. 270 (1982), he found this case "involve[d] many terms of art such as 'workmanlike manner' and 'construction industry standards'

23

and the interpretation of "plans and specifications' that are beyond the common knowledge of the average juror." The judge found that "most typical jurors of common judgment and experience would have a very difficult time and would more than likely be unable to form a valid judgment as to whether Lime's conduct was reasonable." More specifically, the court found "that the terms and standards involved in this action, the deviation from the standards, the casual connection between the deviation and the physical damages, if any, and the monetary amount of the alleged damages are matters beyond the common knowledge and experience of the average juror." The judge, therefore, determined "that expert testimony [was] required for Enclave to successfully prove its breach of contract claims as to Lime." Accordingly, he concluded Enclave would be unable to establish a breach of contract claim against Lime and Lumbermens because the reports and testimony by Enclave's only liability expert were inadmissible at trial. Judge Savio granted summary judgment dismissing count five, concluding there was no "competent expert testimony that there has been any contractual violation by Lime."

As to the sixth count, the judge reiterated that Enclave's negligence claims against Lime were essentially a breach of contract cause of action—not a negligence action. Since summary judgment was granted dismissing the breach

24

of contract claims, summary judgment was also granted to Lime dismissing the negligence claims.

As to Enclave's breach of contract claim against Lumbermens, the judge found there was no basis for liability of the surety on the performance bond because Enclave could not sustain its breach of contract claim against Lime, the bond principal. Accordingly, the court granted summary judgment to Lumbermens and dismissed count seven.

Since Lime and Lumbermens were the only remaining defendants, the judge dismissed the second amended complaint in its entirety without reaching the issue of whether Berman issued an inadmissible net opinion. The judge issued subsequent orders dismissing Lime's counterclaims.

On appeal, plaintiff argues:

> A.  THE COURT ERRED BY FAILING TO APPLY THE SUPREME COURT'S STANDARD IN ARONSOHN v. MANDARA.
>
> > 1. Trial Court Holdings Show Anti-Aronsohn Principles.
>
> B.  BACKER ROD ISSUE.
>
> C.  PROCEDURE LEADING TO MOTION TO BAR [AND] SUMMARY JUDGMENT.

D. THE <u>KEMP</u>[4] POLICY OF FAIRNESS [AND N.J.R.E.] 104 HEARING.

E. NEGLIGENCE COUNTS/DAMAGES.

We find no merit in any of these arguments and affirm substantially for the reasons expressed by Judge Savio in his comprehensive and well-reasoned written decision. Our careful review of the record convinces us that Judge Savio's factual findings are amply supported by substantial evidence in the record and his legal determinations are consonant with applicable legal principles. We add the following comments.

Enclave argues that the trial court erred by failing to apply the principles adopted in <u>Aronsohn</u>. We disagree.

In <u>Aronsohn</u>, homeowners contracted "to add a patio to the rear of their home" in 1974. 98 N.J. at 95. The plaintiffs purchased the home in 1975. <u>Id.</u> at 96. Three years later, "plaintiffs noticed that the patio was beginning to separate from the wall of the house[,]" "some of the slate slabs . . . were beginning to rise[,]" and "the outside patio wall was beginning to buckle." <u>Ibid.</u> Plaintiffs sued the contractor "alleging strict liability, negligence, and breaches of express and implied warranties." <u>Ibid.</u> The case proceeded to trial. The trial

---

[4] <u>Kemp ex rel. Wright v. State</u>, 174 N.J. 412 (2002).

court granted the contractor's motion to dismiss based on lack of privity, the economic loss doctrine, and because no implied warranty of habitability or strict liability applied. Id. at 97. We affirmed.

The Supreme Court reversed, holding that when "there is no express contractual provision concerning workmanship, the law implies a covenant that the contract will be performed in a reasonably good and workmanlike manner." Id. at 98. The Court also held that plaintiffs did not establish that the contractor had violated any express provisions in the construction contract. Id. at 103.

The facts in Aronsohn were readily distinguishable. The Court's reasoning in Aronsohn was based on the absence of an "express contractual provision concerning workmanship . . . ." Id. at 98. Here, Article 3.5 of the contract contains the following express warranty concerning workmanship:

> The Contractor warrants to the Owner that materials and equipment furnished under the Contract will be of good quality, and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted and that the Work will conform with the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear under normal usage.

27

> The Architect/Engineer and/or Owner may require the Contractor to furnish satisfactory evidence as to the kind and quality of materials and equipment.

Aronsohn did not establish a new negligence standard to be applied to a breach of contract claim. The implied warranty adopted in Aronsohn is based on contract law, not negligence principles. See Saltiel v. GSI Consultants, Inc., 170 N.J. 297, 316 (2002) (stating that "in commercial transactions the law may recognize certain implied contractual obligations, such as a builder's obligation to construct a building or structure in a workmanlike fashion" (citing Aronsohn, 98 N.J. at 107)). Failing to complete certain tasks is evidence of a breach of contract, not negligence. Additionally, when there is an express warranty regarding workmanship, negligently completing the tasks set forth in the contract is also evidence of a breach of contract. See Aronsohn, 98 N.J. at 107.

We next address the net opinion issue. The doctrine barring the admission at trial of net opinions is a "corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data." Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (alteration in original) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008)). The net opinion doctrine requires experts to "give the why and wherefore" supporting their opinions, "rather than . . . mere conclusion[s]." Id.

at 54 (quoting Borough of Saddle River v. 66 E. Allendale, LLC, 216 N.J. 115, 144 (2013)).

Experts must "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable." Id. at 55 (quoting Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992)). "Given the weight that a jury may accord to expert testimony, a trial court must ensure that an expert is not permitted to express speculative opinions or personal views that are unfounded in the record." Ibid. See also Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 401 (2014) (holding the expert issued an inadmissible net opinion that represented only his personal view and was not founded upon any objective support); Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011) (same). An expert's conclusion should be excluded "if it is based merely on unfounded speculation and unquantified possibilities." Townsend, 221 N.J. at 55 (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)).

That said, experts may base their opinions upon unwritten industry standards without violating the net opinion doctrine. See, e.g., Davis, 219 N.J. at 413 (quoting Kaplan v. Skoloff & Wolfe, P.C., 339 N.J. Super. 97, 103 (App. Div. 2001)) (recognizing that an expert's opinion may be based on an "unwritten

29

custom or practice" of the industry); <u>Satec, Inc. v. Hanover Ins. Grp., Inc.</u>, 450 N.J. Super. 319, 333 (App. Div. 2017) (noting that an expert's opinion may be based on unwritten "generally accepted standards, practices, or customs of the . . . industry").  The critical element is that the expert's opinion must be based upon written or unwritten objective standards recognized in the field and cannot be merely an expression of the expert's personal subjective view.

Enclave argues that the court erred by not holding an evidentiary hearing even though none of the parties requested one.  Relying on <u>Kemp</u>, Enclave contends trial courts must independently exercise their discretion to hold Rule 104 hearings before barring expert testimony at the summary judgment stage.

N.J.R.E. 104(a)(1) provides that a judge "shall decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."  The judge "may hear and determine such matters out of the presence or hearing of the jury." N.J.R.E. 104(a)(2).  The decision to conduct a Rule 104 hearing rests within the sound discretion of the trial court. <u>Kemp</u>, 174 N.J. at 432.  "Absent a clear abuse of discretion, an appellate court will not interfere with the exercise of that discretion." <u>Carey v. Lovett</u>, 132 N.J. 44, 64 (1993) (citing <u>Henningsen v. Bloomfield Motors, Inc.</u>, 32 N.J. 358, 411 (1960)).

When "the court's ruling on admissibility may be dispositive of the merits, the sounder practice is to afford the proponent of the expert's opinion an opportunity to prove its admissibility at a Rule 104 hearing." Kemp, 174 N.J. at 432-33.  Here, however, the parties expressly agreed that a Rule 104 hearing was unnecessary and consented to the court ruling on the papers, based on Scheerer's deposition testimony and the briefs submitted.  Accordingly, the concerns that prompted the Court in Kemp and Rubanick v. Witco Chem. Corp., 125 N.J. 421 (1991), to require a Rule 104 hearing are simply not present here.  This case does not involve a unique causation theory involving the scientific reliability of an expert's analysis and methodology.  Nor did Scheerer's opinions involve novel scientific principles.  Instead, Lime and Lumbermens challenged Scheerer's factual basis for concluding a breach of contract occurred because he failed to identify and apply Lime's scope of work.  Judge Savio determined Scheerer's opinion was "unreliable because it was not supported by the facts" and deficiencies he listed were not linked to contract terms or specifications.  Thus, the trial court did not abuse its discretion in not holding a Rule 104 hearing.

In addition, Enclave consented to a ruling on the papers and waived a Rule 104 hearing.  If a party "does not object or otherwise preserve an issue for appeal

31                                                                                    A-4058-18

at the trial court level, we review the issue for plain error." State v. Santamaria, 236 N.J. 390, 404 (2019) (citing R. 2:10-2). We will disregard any unchallenged errors or omissions unless they were "clearly capable of producing an unjust result." R. 2:10-2. The party who failed to raise the issue before the trial court "bears the burden of establishing that the trial court's actions constituted plain error . . . ." Santamaria, 236 N.J. at 404-05 (quoting State v. Ross, 229 N.J. 389, 407 (2017)). We find no such plain error.

We next address the trial court's decision to bar Scheerer's report and testimony. "The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend, 221 N.J. at 52 (citing State v. Berry, 140 N.J. 280, 293 (1995)). "As a discovery determination, a trial court's grant or denial of a motion to strike expert testimony is entitled to deference on appellate review." Ibid.

"When, as in this case, a trial court is 'confronted with an evidence determination precedent to ruling on a summary judgment motion,' it 'squarely must address the evidence decision first.'" Id. at 53 (2015) (quoting Estate of Hanges v. Metro. Prop. & Cas. Ins., 202 N.J. 369, 384-85 (2010)). "Appellate review of the trial court's decisions proceeds in the same sequence, with the

evidentiary issue resolved first, followed by the summary judgment determination of the trial court." Ibid. (citing Hanges, 202 N.J. at 384-85).

N.J.R.E. 702 and N.J.R.E. 703 govern the admissibility of expert testimony. "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." N.J.R.E. 702. In order to be admissible, "the intended testimony must concern a subject matter that is beyond the ken of the average juror . . . ." Townsend, 221 N.J. at 53 (quoting Creanga v. Jardal, 185 N.J. 345, 355 (2005)).

In this case, Scheerer's opinions regarding Lime's breach of contract lack adequate objective support. The factual bases for his opinions do not reflect the terms, conditions, and specifications of the contract initially or as modified over time. Nor did he consider the decisions made by Enclave or the role of Enclave's representatives, KDA and O&N. For example, Scheerer's opinions regarding the backer rods and the alleged deficiencies were not linked to the contract terms or specifications. Moreover, his deposition testimony demonstrates that he was not familiar with the terms of the contract, the specifications, the contract drawings, meeting minutes, or the numerous changes to the work to be

performed by Lime as the work progressed. Put simply, Scheerer's factual bases were not reliable.

For these reasons, we conclude that the opinions contained in Scheerer's testimony and reports are inadmissible net opinion that lack adequate objective support. The court did not misapply its discretion in excluding such an expert. Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008) (applying an abuse-of-discretion scope of review to a trial court's ruling on the admissibility of expert opinion in a civil case).

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Green v. Monmouth Univ., 237 N.J. 516, 529 (2019) (citation omitted). We consider "whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995). We accord no deference to the trial judge's conclusions on issues of law. Nicholas v. Mynster, 213 N.J. 463, 478 (2013).

Having upheld the exclusion of plaintiff's liability expert, we readily agree that the court had a sound basis to grant summary judgment to defendants. Here,

there is no viable argument that this is a "common knowledge" case that can go to a jury without proper expert support. Indeed, Enclave acknowledges that "[c]onstruction litigation relies on expert opinion because judges, jurors and lawyers are unfamiliar with construction methods, terms, purposes and standards . . . ." (Ab30). Hence, Lime and Lumbermens were entitled to judgment as a matter of law. See Brill, 142 N.J. at 540.

Enclave's remaining arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

35

A-4058-18